**ELCO CORPORATION, Plaintiff,**

v.

**MICRODOT INC. and Microdot Investing Inc., Defendants.**

**Civ. A. No. 4605.**

United States District Court,
D. Delaware.

March 23, 1973.

On Motion to Modify Preliminary
Injunction June 6, 1973.

Robert K. Payson, Richard E. Poole of Potter, Anderson & Corroon, Wilmington, Del., Stephen M. Axinn, Stuart L. Shapiro, and William V. Alesi of Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff.

Richard L. Sutton of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., John L. Hawkins, and Samuel P. Shaw, Jr., of Shaw, Bernstein, Scheuer, Boyden & Sarnoff, New York City, for defendants.

## OPINION

STAPLETON, District Judge:

### I. THE BACKGROUND.

On March 6, 1973, Microdot Investing Inc., a Delaware corporation, ("Microdot Investing") made a tender offer for shares of common stock of Elco Corporation, a Pennsylvania corporation, ("Elco"). Microdot Investing is a wholly owned subsidiary of Microdot Inc., a Delaware corporation, ("Microdot"), and was formed by Microdot for the purpose of acquiring and holding Elco common stock. Elco's common stock is listed on the American Stock Exchange. There are approximately 1,461,000 common shares outstanding which are held by approximately 3,500 shareholders. Elco's consolidated revenues for fiscal 1972 were $20,374,796. Microdot's common shares are listed on the New York and Pacific Coast Stock Exchanges. It had consolidated revenues for 1971 of $158,968,000.

On March 12, 1973, Elco filed this action seeking, among other things, an injunction preliminarily and permanently enjoining Microdot and Microdot Investing from taking any further steps to consummate the tender offer. Elco contends that the acquisition of Elco stock by Microdot Investing pursuant to the tender offer would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and that in the course of making the tender offer they have violated Sections 10 and 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and 78n, and the regulations promulgated thereunder. On March 14, 1973, this Court entered a temporary restraining order and established an affidavit and briefing schedule on plaintiff's motion for a preliminary injunction. A hearing on this motion was held on March 21, 1973 and the Court then extended the restraining order until 5:00 P.M. on March 23, 1973.

Both Elco and Microdot's Malco division manufacture and sell products known as a metal plate connector or metal plate backpanel connectors. The typical metal plate connector produced by Elco and Malco consists of an aluminum plate into which are plugged variously designed units called connectors. Modules or electric signal processing units are in turn plugged into the connectors which are themselves interconnected by a maze of wires which car-

ry signals between the modules. Electrical impulses which are fed into the system via a computer keypunch, a magnetic tape or a variety of other means are transmitted in a predetermined fashion along the pathways provided by the system through various processing units which transform them into signals which can control anything from machining or manufacturing equipment to computer print out equipment or visual display panels connected to the system. In effect, the total system translates instructions in the form of electrical impulses into orders understandable to a machine on the output end of the system.

Metal plate connectors are purchased by manufacturers of sophisticated electronics equipment for use as component parts in technologically advanced products such as weapons, control computers for Polaris and Poseidon submarines, ground control equipment for NASA, calculators, automated telecommunications systems and computer peripheral systems, among many others. No two customers and no two pieces of equipment require the same metal plate connector system. As a result, metal plate connectors are sold on a custom order basis.

In the early sixties Malco Manufacturing Company, a then small electronics terminal manufacturer in Chicago, developed, in conjunction with the United States Navy, the first metal plate connector for the purpose of furnishing connectors of extremely fine tolerances and dependability for the Navy's Polaris missile submarine program. The first deliveries to the Navy were made in 1961. Thus Malco Manufacturing Co. was initially the only manufacturer of metal plate connectors in the United States. In 1961 sales of these connectors were less than $500,000. Between 1961 and 1963 Amphenol (now a division of Bunker Ramo), National Connector and Elco began making metal plate connectors. Elco and Malco Manufacturing Company competed in the sale of

metal plate connectors from that time until January of 1971.

In January of 1971 Microdot acquired the business and assets of Malco Manufacturing Company and Mandex Manufacturing Company, Inc. and created its present Malco Division (hereinafter "Malco"). Since January of 1971 Microdot has competed with Elco in the sale of metal plate connectors.

Between August 1972 and January 1973 Microdot acquired substantial quantities of Elco's common stock in street name accounts. By the end of that period Microdot had acquired approximately 4.3% of all Elco common stock outstanding. In February of 1973 Microdot Investing was formed and these shares were assigned to it.

On March 5, 1973 Microdot filed a Schedule 13D with the SEC announcing its intention to have Microdot Investing acquire by way of cash tender offer a minimum of 700,000 additional shares of Elco common stock at a price of $7.00 per share. The closing price of Elco common stock on the trading day prior to its filing was $5.25. This schedule and the tender offer issued the next day stated that Microdot, "through directly owned divisions and through subsidiaries, is engaged primarily in the United States in the manufacture and sale of fasteners, electrical connectors, ingot molds and cranes, barges and heavy fabrications and a number of other industrial products." Neither described the business of Microdot further. The business of Elco was not mentioned. Both documents stated with respect to the purpose of the transaction:

Microdot intends through this Offer to acquire a number of shares of Elco Common Stock which will give Microdot Parent working control of Elco, and Microdot Parent intends to seek representation on Elco's Board of Directors. Depending on the outcome of the Offer, Microdot and Microdot Parent will consider merging Elco with Microdot Parent, Microdot or another subsidiary of Microdot Parent. In the event of a merger, the then stock-

holders of Elco would have a right to receive securities or other property of Microdot Parent, Microdot or such other subsidiary at an exchange rate which has not been determined but which would be fixed after consultation with an independent investment banking firm in respect of a fair exchange rate. Neither Microdot nor Microdot Parent has any present plan to liquidate Elco or to sell its assets. Neither of them has formulated any plans as to whether any major changes will be made in Elco's business or organization. Plans in that connection will be determined after an analysis of Elco's operations when working control is obtained.

As the tender offer noted, if Microdot Investing obtains an additional 700,000 shares of Elco common stock pursuant to the offer, it will own about 51% of the presently outstanding Elco common stock.

## II. THE PLAINTIFF'S BURDEN.

▮ Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes this Court to grant relief against a threatened violation of the anti-trust laws "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity. . .". Thus, while "injunctive relief is particularly suited to the preventive function of § 7,"[1] the rules relating to the prerequisites for preliminary and permanent injunctive relief in Section 7 cases do not differ materially from those applicable in other areas. Where preliminary injunctive relief is sought the Court must weigh the potential of irreparable harm to the plaintiff absent judicial intervention, the potential of irreparable harm to the opposing party from judicial interference, the potential harm to the public interest and the likelihood of the plaintiff's prevailing on the merits. Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., 414 F.2d 506 (3rd Cir. 1969); Winkleman v. New York Stock Exchange, 445 F.2d 786 (3rd Cir. 1971); Nelson v. Miller, 373 F.2d 474 (3rd Cir. 1967).

In the *Allis-Chalmers* case, the Third Circuit discussed the plaintiff's burden as follows:

Recognizing that preliminary relief is a serious remedy, and because application for such relief, particularly in a complex case, is often based on a record less comprehensive than that which a full adjudication would yield, the courts have required that a plaintiff show a reasonable chance of ultimately prevailing on the merits. In an action by a private party, the plaintiff must also show that it will suffer irreparable injury unless relief is granted. Note, 40 N.Y.U.L.Rev. 771, 778 (1965).

\* \* \* \* \* \*

The burden so imposed is warranted by the extraordinary nature of the relief which is sought. But I am also mindful of the fact that it is preliminary relief which is being requested, and if the moving party establishes a reasonable probability of a § 7 violation the "possibility that the court may decide the right to permanent relief adversely to plaintiff does not preclude it from granting the temporary relief \* \* \*." . . .

▮ This Court has twice recognized,[2] by reference to Judge Frank's opinion in Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2nd Cir. 1953), that the balance of hardships may have a bearing on the plaintiff's burden with respect to his likelihood of ultimate success. The Second Circuit expressed the rule as follows in Checker Motors Corporation v. Chrysler

---

1. Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., 294 F.Supp. 1263, 1265 (D.Del.1969).

2. Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., 294 F.Supp. 1263 (D.Del.1969); Vanadium Corp. of America v. Susquehanna Corp., 203 F.Supp. 686 (D.Del.1962).

Corporation, 405 F.2d 319, 323 (2nd Cir. 1969):

. . . "*the burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief.*" Dino De Laurentiis Cinematografica, S. p. A. v. D–150, Inc., [366 F.2d 373, 375 (2 Cir. 1966)]. In such a case, *the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation.* Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 205 (2 Cir. 1966); Dino De Laurentiis Cinematografica, S. p. A. v. D–150, Inc., supra; Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953). (emphasis added) (some citations omitted.) 405 F.2d at 323.

This rule was reaffirmed by the Second Circuit in Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company, Inc., 476 F.2d 687 (1973).

I do not consider this rule to be inconsistent with anything stated in the relevant opinions of the Third Circuit Court of Appeals. I need not rest my present decision, however, on the Second Circuit's articulation of the rule. As will appear hereafter, I conclude that Elco has made a clear showing of a reasonable probability of success.

## III. THE CLAYTON ACT CLAIM.

### A. *The Relevant Market.*

Section 7 of the Clayton Act proscribes acquisitions of stock where the effect may be substantially to lessen competition in any line of commerce. As a predicate to determining the legality of an acquisition under this statute it is necessary to delineate the product and geographic markets in which competition may be adversely affected. United States v. DuPont & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). The determination of this rele-

vant market is the first step in our analysis.

Both parties agree that the relevant geographic market is a national one. They differ, however, on the relevant product market.

Defendants here characterize the relevant product market as "backpanel connector assemblies," a category which is comprised of three elements: metal plate connectors, discrete printed circuit connectors, and backpanel connector assemblies made "in house" by equipment manufacturers. Plaintiff's position, on the other hand, is that the relative market is metal plate connectors only. For the reasons set forth below the Court finds the relevant market to be comprised of metal plate connectors.

The three elements of the market definition suggested by the defendant may be sufficiently interchangeable to permit of their classification as a single market; however, if so, there exists sufficient substantial differences in product and price among them to compel a finding of metal plate connectors as a distinct submarket for Clayton Act purposes. Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

In *Brown*, the court laid down seven criteria for the proper delineation of a submarket:

. . . industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. . . . *Id.* at 325, 82 S.Ct. at 1524.

Not all seven indicia must appear in order to properly define a submarket. Reynolds Metals Co. v. F.I.C., 114 U.S. App.D.C. 2, 309 F.2d 223 (1962). Here several of these indicia are present.

A "backpanel connector assembly" is a system for modifying electric current in a predetermined way. Such assemblies are used in electronic calculating machines, computers, and other sophisticat-

ed electronic gadgetry. A metal plate connector is a backpanel connector assembly custom designed as a complete unit for a specific piece of electronic equipment. Discrete printed circuit connectors are components which may be assembled into various configurations to perform the backpanel assembly function on various types of electronic equipment with differing requirements.

A customer faced with the need to provide a backpanel assembly to perform a specific function has three options: he may design and build his own backpanel assembly from raw materials, he may purchase discrete printed circuit connectors and provide his own design and expertise in arranging the components into a functioning backpanel connector assembly or as his third alternative, he may purchase a completed metal plate connector designed and assembled by the vendor to meet the buyer's specific requirements.[3]

The purchaser of a metal plate connector is buying not only the hardware from which a backpanel assembly may be constructed, as is a purchaser of printed circuit connectors but buys additionally the service of assemblage and more importantly the design expertise of the vendor in providing a completed backpanel assembly tailored to the buyer's particularized needs. This distinction is even clearer between the purchaser of a metal plate connector and the "in house" producer of a backpanel assembly. Such a producer buys only raw materials and obviously buys no components, assemblage service, or design expertise. The sales material of both Malco and Elco indicate that an important part of the metal plate connector product is the technical know-how and expertise of the vendor.

Thus while it is true that electrical equipment manufacturers needing backpanel connector assemblies have alternatives open to them at least at the point of original design of their equipment, a producer of metal plate connectors comes to the market place with a product having distinct characteristics—a complete custom made package requiring no contribution of labor or design know-how from the purchaser.

In addition the record indicates that even comparing metal plate connectors with what may be developed by the purchaser with discrete printed circuit connectors, there are significant product distinctions. The reasonable inference from the record is that metal plate connectors are more reliable. It is undisputed that they can handle higher electrically powered devices and have basic rigidity so that they can form an integral part of the equipment structure.

One further fact seems to me significant in evaluating the characteristics and uses of metal plate connectors. While electrical equipment manufacturers have three options open to them at the point of original design of a particular piece of equipment, that unfettered flexibility does not continue beyond that point. Elco's affidavits indicate that throughout the duration of its manufacture of a particular piece of equipment a manufacturer's initial choice cannot be altered without redesign of the equipment and attendant expense. This seems reasonable and although Microdot asserts that the redesign problem is not significant, I do not read its affidavits as offering any example of a manufacturer which has made such a change after the design stage. Accordingly, I conclude that when a purchaser comes to the market after the design stage, he

---

3. The fact that these alternatives exist does not necessarily mean that all manufacturers confronted with the decision easily or frequently move from one alternative to the other. My understanding from oral argument is that the large manufacturers included in Microdot's figures for "in house" makers of backpanel connector assemblies consistently follow the "in house" route for the vast majority of their needs and consistently account for only a small percentage of the sales of metal plate connectors and discrete printed circuit connectors.

has a distinctive need which only metal plate connectors can fill.

The record further indicates that the distinctive characteristics and uses of metal plate connectors have resulted in the recognition of this market in the industry as a separate economic entity. I base this conclusion primarily on two record documents. The Electrical Industries Association recogizes metal plate connectors as a submarket in their Marketing Service Department Reports. Similarly, a comprehensive marketing survey done by Elco by an independent consulting firm prior to, and independent of, this dispute analyzes the market for metal panel connections as a distinct market.

Finally, Elco has submitted evidence that metal plate connectors are higher priced than discrete printed circuit connectors. This appears reasonable in view of the product differences enumerated above and is not disputed in the Microdot affidavits.

These facts sufficiently define a relevant submarket for Clayton Act purposes.

### B. *The Characteristics Of The Relevant Market.*

Hard data on the size and structure of the metal plate connector market are not available. The parties have tendered sharply conflicting estimates. According to Microdot's statistics, total sales of metal plate connectors for the year 1972 amounted to $33.3 million, the largest six companies had 61% of the market, and Microdot and Elco rank second and third in the market in terms of sales with roughly 11% of the market apiece. These figures are based on "conservative estimates" of a Microdot employee. Elco's statistics, on the other hand, make it appear that total sales

amounted to $23.4 million, that the largest five companies had 60% of the market, and that Elco's and Microdot's combined shares of the market amounted to 31%. The exact ranking of the two companies in the market is not determinable from the statistics submitted by Elco but based upon those figures they were certainly no less than the second and third ranking firm in the market in terms of sales. Elco's statistics with respect to all firms which report to the Electronic Industries Association (EIA) are based upon data published by that association. With respect to those firms in the market which did not report their sales to EIA,[4] Elco adopted *Microdot's* market figures.

Based on what is presently before the Court, the figures proffered by Elco have a greater claim to credibility and thus will be adopted for present purposes as approximating the current status of the metal plate connector market. Their greater reliability flows from their base in EIA data and the fact that they correlate rather closely with the results of an independent marketing survey by IMA Incorporated compiled prior to the tender offer in this case which estimates sales of metal panel connectors of $20.9 million for 1972.

The market shares of the top three firms cannot be determined from Elco's figures alone. Its data indicates that in 1972 Elco's total sales were $3.7 million, Microdot's sales were $3.6 million, and industry sales were $23.4 million, Microdot agrees with these sales figures for Microdot and Elco but places AMP Inc. in first place with sales of $4.0 million. Elco's figures are not sufficiently broken down to determine the rank of the three largest companies or AMP's sales volume. Assuming that Microdot's estimate of AMP's sales is roughly correct, a merger between Elco with about 16% of the market and Microdot with about 15% of the market will result in

---

4. Of all the firms in the market, seven (Elco, Bunker Ramo, TRW, AMP Inc., ITT, Methode, Masterite) reported their sales to EIA; seven other substantial firms in the market do not report to EIA (Microdot, Teradyne, Fabri-Tek, Litton, Connector Technology, Berktek, Dyna-Teck.)

an increase in concentration in the order of 50%.[5]

The metal plate connector industry is a concentrated one. According to Elco's figures, the five largest companies control 60% of the market.[6] According to the study made by Professors Kaysen and Turner, cited approvingly by the Supreme Court,[7] where the largest eight firms have 50% or more and the largest twenty firms have 75% or more, the industry can be said to be highly concentrated to the point of oligopoly.[8] In the instant situation, Elco's statistics indicate that the five largest companies control 60% of the sales volume in the relevant market, and the fourteen largest companies control virtually 100% of the market.

There is evidence that the market relevant to this inquiry has been undergoing a process of deconcentration over the last decade. As previously noted, Malco was the pioneer in the industry and early in the nineteen sixties controlled the entire market. Since that time other firms have entered the fray and the early dominant market forces have steadily lost ground to them. There is also evidence that Microdot's and Elco's combined share of the market has decreased substantially since as recently as 1969.[9] However, as stated above, Microdot and Elco are, at the least, still the second and third largest firms in terms of sales in the relevant market.

There are some suggestions of market barriers to entry [10] but on the present record and in the face of what appears to be relatively frequent access in the past, I cannot say that they are substantial.

C. *The Effect On Competition.*

■ In *Philadelphia National Bank* the Supreme Court stated that:

. . . a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects. . . . 374 U.S. 321, 363, 83 S.Ct. 1715, 1741 (1963)

in that case the court held that a merger between the second and third largest banks in the relevant market which would have resulted in a bank with 30% of the relevant market and which would have resulted in an increase in concentration among the top two banks of about 33% violated the Clayton Act in the absence of an affirmative showing that the merger was not likely to have anti-competitive effects.

At this stage, this case seems clearly to fall within the rule announced in *Philadelphia National Bank*. Both sides agree that the parties here are among

---

5. Based on the above sales figures AMP and Elco ranked one and two in the market with total sales volume of 33% of the relevant market. Following a merger of Elco and Microdot the combined market share of AMP and the surviving corporation would be about 48%. Thus the increase in concentration of the top two firms would be about 50%. See United States v. Philadelphia National Bank, 374 U.S. 321 at 365, n. 42, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

6. Microdot's figures reveal that the six largest firms control 61% of the relevant market and the eleven largest control 87% of the market so the two calculations are fairly consistent on this point.

7. United States v. Philadelphia National Bank, 374 U.S. 321, 364 n. 41, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

8. Kaysen and Turner, Antitrust Policy: An Economic and Legal Analysis, pp. 27–28 (1959).

9. Elco has not submitted any estimates of industry wide sales for prior years; Microdot estimates that the combined shares of Microdot and Elco has shrunk from 57% in 1969 to 22% in 1972.

10. E. g., development or acquisition of technical expertise or know-how; barriers presented by existing patents held by other market participants.

the top three firms in terms of sales in the relevant market. The Court has found that their merger would result in a firm with 31% of the relevant market and from the best available evidence it appears that the increase in concentration among the top two firms would be about 50%. The industry can be characterized as presently concentrated. Under *Philadelphia National Bank* this clearly makes out a *prima facie* violation of Section 7.

Microdot presses two countervailing considerations: first, the market is presently decentralizing, and second, the parties, although presently substantial factors in the market, face competition from much larger corporations.

■ The answer to Microdot's first argument is that this market, while it has recently experienced a decentralizing trend, nevertheless remains a highly concentrated one. The acquisition at issue is one between two healthy competitors with substantial shares of the market. I conclude that the decentralizing trend in such circumstances is not evidence "clearly showing that the merger is not likely to have anti-competitive effects." [11]

■ The second defense raised by Microdot is answered by United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1965). In *Von's* a merger between the third and sixth largest retail food chains in the Los Angeles market was challenged. The merger was defended on the basis that the merging companies were local in nature and needed their combined resources to compete effectively with larger national food retailers in the relevant

market. The court in rejecting this argument relied heavily on the strong position of Von's and the acquired firm in the local market and ignored the strength of the competing firms [12] in other than the relevant market. *Cf.* United States v. Philadelphia National Bank, *supra,* 374 U.S. at 370, 83 S.Ct. 1715. Under *Von's* it is not relevant that the parties must compete against companies with greater assets than they themselves have when the parties already occupy a strong position in the market. The following conclusion from *Von's* is equally applicable here on the present record:

> This merger cannot be defended on the ground that one of the companies was about to fail or that the two had to merge to save themselves from destruction by some larger and more powerful competitor. 384 U.S. at 277, 86 S.Ct. at 1482.

■ Further, it is noteworthy that the court condemned the merger of Von's Grocery and Shopping Bag Food Stores even though neither had any prior history of growth by acquisition. 384 U.S. at 296, 86 S.Ct. 1478 (Stewart, J., dissenting). An even stronger case for the likelihood of anti-competitive effects is established where, as here, the acquiring corporation has a prior history of growth by acquisition in the relevant market. Malco, the subsidiary of Microdot competing in the relevant market, was acquired by Microdot in 1971. Now Microdot is attempting to acquire Elco. The result, if permitted, would produce a situation where, within the space of two years, a company outside the relevant market has become the larg-

---

11. The cases which defendants cite as approving horizontal mergers when the merging firms were within deconcentrating markets do not avail him here. In United States v. Tidewater Marine Service, Inc., 284 F.Supp. 324 (E.D.La.1968) and in E. L. Bruce Co. v. Empire Millwork Corp., 164 F.Supp. 446 (S.D.N.Y. 1958) the number of market participants ran into the hundreds. In Lunkenheimer Co. v. Condec Corp., 268 F.Supp. 667

(S.D.N.Y.1967) the court, while not mentioning the number of firms in the relevant market, noted that the industry was not highly concentrated. Here, as discussed above, the industry is a concentrated one with at most fewer than twenty participants.

12. National chains like Acme Markets, Boy's Markets and Krogers.

est competitor in the relevant market by the acquisition of companies with 15% and 16% of the relevant market, respectively.

In short, there is a reasonable probability that Elco will be able to establish at trial that the effects of Microdot's acquisition of Elco's shares may be substantially to lessen competition in the relevant market.

## IV. THE 1934 ACT CLAIMS.

■ Elco charges that Microdot and Microdot Investing have violated Sections 10 and 14 of the Securities Exchange Act of 1934 in a number of respects. In all except one instance Elco has failed to convince this Court that it has a reasonable probability of ultimate success on these claims. Accordingly, only one need be discussed.

Section 14(e) of the 1934 Act provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

Rule 10(b)5 makes the same conduct unlawful in connection with the purchase or sale of any security where any means or instrumentality of interstate commerce is utilized.

In Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 845 (2nd Cir. 1970) the Second Circuit defined the standard of materiality in a similar context in terms of "inaccurate statements [or omissions] . . . which may have had some tendency to affect the decision of the [target company's] stockholders with respect to the . . . offer."

Elco maintains that Microdot and Microdot Investing violated these sections of the 1934 Act, as so construed, by failing, in connection with the tender offer "to disclose that Microdot and Elco are engaged in substantial direct competition in the design, manufacture and sale of metal plate connectors, are potential competitors in other markets for electronic connectors and related equipment, and that as a result of such present and potential competition, Microdot's acquisition of control of Elco through this tender offer would be in violation of Section 7 of the Clayton Act."

Defendants respond by asserting that "no violation of Section 7 of the Clayton Act will occur if Microdot is successful in acquiring the additional shares of Elco pursuant to its tender offer." Thus, Microdot asserts "it would have been false and misleading for Microdot to have asserted that its acquisition of control of Elco would constitute a violation of Section 7 of the Clayton Act." It also stresses, in connection with this argument and its other responses to Elco's securities law claims, that speculations about possible future anti-trust litigation or other future problems would have been misleading.

I find a reasonable probability that Elco will prevail on its claim that Microdot and Microdot Investing violated Section 14(e) and Rule 10(b)5. It is probable that Elco will be able to demonstrate that at the time of the offer: (1) there were facts known to defendants which raised serious and substantial questions about the legality of the tender offer under the Clayton Act, (2) those facts were omitted under circumstances which made the facts stated misleading and (3) the omitted facts were material.

At a minimum, the present record makes it appear that the facts regarding the position of Malco and Elco in the metal plate connector market raised serious and substantial questions about the legality of the transaction. If so, they held the potential of effecting the judgment of Elco's stockholders on whether

and how much to tender. These basic facts could have been stated without speculation on future events. They were not stated.[13]

As the Second Circuit Court of Appeals observed in Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company, Inc., *supra* (in the course of sustaining the issuance of a preliminary injunction by the lower court under similar circumstances):

The fact that, at the time it announced its tender offer, an anti-trust action had not been commenced against G & W, and that its liability was uncertain, does not excuse G & W's failure to disclose all these relevant circumstances so that A & P shareholders could weigh them in reaching their decision whether or not to tender their shares. As we said in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2 Cir. 1968) (en banc), cert. denied sub nom. Kline v. SEC, 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed. 2d 756] (1969), the disclosure requirements of the securities laws require "nothing more than the disclosure of basic facts so that outsiders may draw upon their own evaluative experience in reaching their own investment decisions with knowledge equal to that of the insiders." Those "basic facts" bearing upon G & W's possible liability for anti-trust violations were of obvious concern to those A & P shareholders who retained part of their holdings.

We hold that the record before the district court demonstrated a probability of A & P's success on the merits on its claims of securities law violations.

## V. BALANCING THE INTERESTS OF THE PARTIES AND THE PUBLIC.

Likewise, Elco has carried its burden of demonstrating the probability of irreparable injury to it if preliminary relief is denied.

Microdot, an Elco competitor, has publicly announced its intention to assume control of Elco. A reasonable inference arises that changes are intended. Merger is a publicly avowed possibility. Microdot says it has no plans as to whether major changes will be made in Elco's business or organization, but declares that it won't be able to formulate any such plans until "after an analysis of Elco's operations when working control is obtained." As this Court and others have had occasion to observe in the past,[14] such uncertainty in the world of business may be as devastating as accomplished unfavorable fact. A takeover bid of this kind creates uncertainties about the target corporation which are bound to concern its customers. This is particularly true in a market like the instant one where many contracts require long term commitments. There are already signs that this uncertainty will take a rapid and substantial toll here. There has been a sharp drop in domestic orders booked by Elco since the publication by Microdot of its tender for Elco shares. For the four weeks preceding the publication of the offer on March 7, Elco booked, respectively, $473,405, $562,868, $438,282 and $569,027 in domestic orders. Domestic orders for the week during which the tender offer was announced dropped to $389,100. Domestic orders in the first full week after the offer dropped to $239,810. While there may be other explanations for this drop, I consider it more likely on the present record that the customers of Elco understandably are unwilling to make long term commit-

---

13. The reference to Microdot's being in the "electrical connector" business would clearly not be sufficient if the facts are as they currently appear from this record.

14. *E. g.,* Crane Company v. Briggs Manufacturing Company, 280 F.2d 747 (6th Cir. 1960) ; American Smelting & Refining Company v. Pennzoil United, Inc., 295 F.Supp. 149 (D.Del.1969).

ments when they are uncertain about Elco's future. To be sure, there is nothing this Court can do to eliminate all of that uncertainty and consequent injury to Elco and its stockholders. Some injury is inevitable in a situation of this kind. I conclude, however, that the extent of this injury is likely to be substantially less if Microdot is now restrained than it will be if Microdot is allowed to pursue its objectives.

■ Moreover, I agree with Elco that the placement of Microdot nominees on Elco's board would hold the potential of serious irreparable injury to Elco. While there is a dispute on this record as to whether or not Elco has trade secrets whose misappropriation would involve substantial loss, a "listening line" is nevertheless a serious matter. As the court observed in the *Crane* case:

> The most serious ramification though is the "listening line" which Crane would have in Briggs. As Chief Judge Levin stated "since the two companies are competitors, the Briggs Board would be unable to perform its proper functions in connection with the management of the company without divulging to a competitor confidential information with respect to the development of processes and techniques; plans for improvements of products and plans for sales and promotion campaigns."

See also Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., 414 F. 2d 506 (3rd Cir. 1969).

■ Turning to the public interest, if it appeared that Microdot was in a position to seize control of Elco's board prior to a determination of the case on the merits, this case would be very similar to the situation presented in American Smelting & Refining Co. v. Pennzoil United, Inc., *supra,* and the public interest would weigh heavily in favor of preliminary relief. As Judge Wright there observed:

> . . . if probable anti-competitive effects may reasonably be expected to manifest themselves in the interim between denial of preliminary relief and final determination of the merits and those anti-competitive effects are irreversible, the injury to the public which follows is entitled to considerable weight. See United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 568–570 (N.D.Ill.1968).

> Here, in view of the imminence of the Pennzoil takeover and the reasonably long period of time which might be required to prepare for final hearing, the likelihood of injury to the public is more than speculative and thus entitled to consideration by the Court. 295 F.Supp. at 157–158.

Here Microdot's acquisition of 51% of the stock of Elco is imminent. The next annual meeting of Elco's stockholders, however, is not scheduled to occur until October of 1973, and the present record does not provide a basis for determining whether there is any possibility of Microdot's assuming formal control of the board, by expansion or otherwise, prior to that time. Even if board control is not imminent, however, this fact only diminishes and does not extinguish the public interest as a factor to be considered. First, the case may well take more than six months to terminate. More importantly, however, the potential for future control, as a practical matter, is bound to influence Elco's market place decisions to some degree in the interim.

■ As far as Microdot is concerned, the issuance of a preliminary injunction will mean that it will lose an opportunity to acquire a controlling interest in Elco. The loss may or may not be temporary. The same conditions may not exist again. If so, Microdot will be irreparably injured. I conclude, however, that where the probability of unlawfulness and of injury to others is as strong as it is here, the acquiring corporation's interest in the consummation of the transaction must be subordinated. Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company, *supra;* Allis-Chalmers Mfg. Co. v. White Consolidated Indus. Inc., *supra.*

Similar considerations apply with respect to those Elco shareholders who have tendered their shares in response to the offer. Microdot stresses that a preliminary injunction barring consummation of the tender offer will deprive these stockholders of their premium.[15] If Microdot's acquisition is in violation of the Clayton Act, this is a premium to which they cannot justly lay claim. If Microdot is vindicated and conditions permit the resuscitation of the offer, the loss will be a temporary one. If conditions do not permit renewal of the offer at the termination of this litigation, the tendering stockholders may indeed suffer some irremedial loss. On this record, however, I conclude that this limited interest of Elco's tendering stockholders must yield.

One further word is necessary. Microdot asks that, in the event some preliminary relief is to be granted, it be in a form which will permit the tender offer to go forward on some terms and will only enjoin Microdot from exercising the voting power of the stock acquired. I decline to follow this course. The argument, of necessity, rests on the proposition that this Court can always order divestiture in the event a Clayton Act violation is ultimately found and thereby reestablish the status quo ante. This Court's power to order divestiture in an action of this kind is not altogether clear. Allis-Chalmers Mfg. Co. v. White Consolidated Indus. Inc., *supra*. Assuming the presence of the power, however, divestiture does not always turn out to be a feasible remedy and is never a painless one. Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., *supra*; Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (1969); United States v. Chrysler Corp., 232 F.Supp. 651 (D.N.J.1964). Most importantly, however, I am convinced that the acquisition by Microdot of 51% of Elco's common stock, even subject to restrictions on voting, would exacerbate the problems caused by the uncertainty of Elco's future and result in substantially greater injury to Elco's business during the course of this litigation than if consummation of the tender offer is enjoined. The injury to Elco that would occur if a limited injunction were entered is, I conclude, greater than the injury to Microdot and the tendering Elco shareholders that might be avoided by limiting the relief as defendants request.

In short, balancing the respective interests of the parties and the public, I conclude that a preliminary injunction should be entered restraining defendants from taking any further step in furtherance of the tender offer.

MEMORANDUM OPINION

ON MOTION TO MODIFY PRE-
LIMINARY INJUNCTION

This action was instituted by Elco Corporation ("Elco") seeking preliminary and permanent injunctive relief against a tender offer for its common stock which had been made by Microdot, Inc. through its subsidiary Microdot Investing, Inc. (hereafter collectively "Microdot"). Elco alleged that the acquisition of its stock by Microdot would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.[1]

In particular, the complaint charged (1) that Elco and Microdot were actual competitors in the metal plate connector market and "potential and prospective"

---

15. Were the probability of a 1934 Act violation the only problem here, preliminary injunctive relief could probably be fashioned, short of an absolute bar to the tender offer, which would permit these stockholders to reevaluate their tender with the benefit of all material facts. See Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2nd Cir. 1969). Such relief is not appropriate here, however, in view of the antitrust aspects of the case.

1. The complaint also included a count charging a violation by Microdot of the Securities Exchange Act, but this claim is not relevant for present purposes.

competitors in a "number of related markets",[2] and (2) that Microdot's acquisition of Elco would tend substantially to lessen competition in these markets. The evidence offered by Elco in support of its application for a preliminary injunction was limited solely to the effect of the acquisition on the metal plate connector market. After briefing and argument, the Court concluded that Elco had demonstrated a reasonable probability of success on its claim that the acquisition would tend substantially to lessen competition in that market and entered a preliminary injunction containing the following two paragraphs:

"2. Defendants are hereby preliminarily enjoined from purchasing or acquiring, directly or indirectly, any shares of Elco Corporation common stock not held as of the date of this Order, whether through tender offer or otherwise;

3. Defendants are hereby preliminarily enjoined from voting or granting any proxy to vote, directly or indirectly, or utilizing in any fashion whatsoever, any shares of Elco Corporation stock heretofore acquired by defendants to seek control of Elco Corporation by defendants."

Microdot has now moved to modify these paragraphs of the preliminary injunction to read as follows:

"2. Until further order of this Court, defendants are hereby preliminarily enjoined from purchasing or acquiring, directly or indirectly, any shares of Elco Corporation common stock not held as of the date of this order, whether through tender offer or otherwise, unless and until defendant Microdot Inc. shall first have either (a) disposed of its metal plate connector business, or (b) made irrevocable arrangements for the divestiture of the metal plate connector business of either plaintiff or defendants promptly after any acquisition by defendants, or either of them, of additional shares of Elco Corporation common stock, in either case, to a person, persons, firm or corporation not affiliated with Microdot and not engaged at the time of such divestiture in the manufacture or sale of metal plate connectors in an annual sales volume of more than $100,000.00.

3. Until further order of this Court, defendants are hereby preliminarily enjoined from voting or granting any proxy to vote, directly or indirectly, or utilizing in any fashion whatsoever, any shares of Elco Corporation common stock heretofore acquired by defendants to seek control of Elco Corporation by defendants, unless and until defendant Microdot Inc. shall first have either (a) disposed of its metal plate connector business, or (b) made irrevocable arrangements for the divestiture of the metal plate connector business of either plaintiff or defendant promptly after any acquisition by defendants, or either of them, of such control, in either case, to a person, persons, firm or corporation not affiliated with Microdot and not engaged at the time of such divestiture in the manufacture or sale of metal plate connectors in an annual sales volume of more than $100,000.00."

In support of this motion, Microdot explains that the tender offer pending at the time of the filing of the complaint in this action has been abandoned and that all stock tendered thereunder has been returned. Microdot has not, however, abandoned its designs on Elco.

2. The "related markets" are not specifically defined but this reference comes in the context (i. e. Complaint, par. 17) of an allegation that three, specified "recent innovations" of Elco technology would compete with Microdot products and that the acquisition would detrimentally effect competition by terminating the development of these innovations. The complaint also states that Elco and Microdot are competitors in the electronic connector market, but no adverse effect or competition in that market is charged apart from the alleged adverse effect on the included metal plate connector market.

Rather, it has concluded that "the game is not worth the candle as far as the metal plate connector business goes" and that it would be willing to make irrevocable arrangements to divest itself of its metal plate connector business for the metal plate connector business of Elco, if such a divestiture would enable it to make a new tender offer.

Elco resists the modification of the preliminary injunction relying on a line of cases emanating from United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). The teachings of this line of cases have recently been summarized by the Tenth Circuit Court of Appeals in Securities and Exchange Commission v. Jan-Dal Oil & Gas, Inc., 433 F.2d 304, 305 (10th Cir. 1970), as follows:

> This court in Ridley v. Phillips Petroleum Co., (10 Cir.) 427 F.2d 19, at 22, set forth the limitations of judicial discretion in setting aside an existing injunction thus:

> The guidelines for modifying or dissolving an injunction were clearly set out by the Supreme Court of the United States in United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999, and recently restated by the Eighth Circuit in Humble Oil & Refining Co. v. American Oil Co., 405 F.2d 803 (8th Cir.). These two cited cases hold that where a modification of an injunctive decree is sought the court should determine 'whether the changes are so important that dangers, once substantial, have become attenuated to a shadow,' and it must be shown that the moving party is exposed to severe hardships of extreme and unexpected nature. Thus the requested change should be approached with caution and a strong showing is required of new conditions and circumstances making the original injunction oppressive.

These guidelines are applicable in all instances where, as here, the relief sought is escape from the impact of an injunction. United States v. United Shoe Machinery Corp., 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562.

 It well may be, as defendants contend, that this statement of law gives "the Swift decision a rigidity the Court did not intend". King-Seeley Thermos Co. v. Aladdin Industries, Inc., 418 F.2d 31, 34 (2nd Cir. 1969). *Swift* clearly holds however, that an injunction "may *not* be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree (the elimination of monopoly on restrictive practices) have not been fully achieved." United States v. United Shoe Machinery Corp., 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968). By this standard, a modification which will not give complete assurance that the objectives of the original injunction will be achieved should not be permitted. The requested modification, in my judgment, will not give that kind of assurance.

Consider, for example, the simplest of Microdot's two proposals, the divestiture by Microdot of its metal plate connector business. Microdot is frank to admit that it currently has "no deal" for the sale of its metal plate connector business. Yet without further information concerning the identity of the purchaser, the terms of the sale, and precisely, what would be conveyed under the generic term "metal plate connector business", this Court has no way of evaluating whether the acquisition of Elco stock by Microdot after such a divestiture would or would not tend substantially to lessen competition in the metal plate connector market. Under Microdot's proposal it would not be wholly out of the metal plate connector market after its acquisition of Elco, and Elco claims that the proposal and its effect are in reality no different from the

original take over plan and its effect. Elco's affidavits, which were unchallenged on the point, indicated that the metal plate connector market is currently suffering from an over capacity problem and that Microdot, following its take over, would be in a position to liquidate assets and be in an even stronger competitive position than would be suggested by a pro forma combination of the two companies' sales and earnings figures. If Microdot's divestiture of its "metal plate connector business" included only its metal plate connector production facilities, for example, and if those facilities are sold to a purchaser with weak competitive capacity, the subsequent combination of Microdot and Elco, with Microdot's personnel, technical know-how, distribution channels and other contacts, might well have a substantial, detrimental impact on competition in the metal plate connector market.

The risks attendant to Microdot's proposal would, of course, be obviated if the present preliminary injunction is allowed to stand with the understanding that Microdot, should it find a purchaser and negotiate a specific deal, could apply at that time for a modification of the injunction to permit a renewal of the tender offer. Elco maintains that this is precisely how the matter should be handled, with Microdot having the burden of showing that the acquisition, after such a divestiture, would not have a substantial anti-competitive effect.

Microdot's response is threefold. First, it says that if it must come to this court and publicly announce that it has a deal, it will be common knowledge in the securities market that a fresh tender offer will follow modification of the injunction and the price of Elco stock may well be driven up to a point where a tender offer with the necessary premium would not be economically feasible.[3] Second, Microdot avows that it has no desire to litigate the question of whether its acquisition of Elco under the current circumstances would constitute a violation of Section 7[4] and asserts that Elco's alternative proposal would require it needlessly to litigate that question pending its negotiation of a deal for the sale of its metal plate connector business. Finally, Microdot indicates that if there be any problem with its proposal for modification of the preliminary injunction, the problem is solely one of framing a modified decree which will foreclose any anti-competitive plan and that it is willing to have the Court write into a modified order any conditions which the Court feels desirable to assure that the purposes of the Clayton Act will be upheld.

The fallacy in defendants' approach is that the problem is not solely one of mechanics and draftsmanship. If the Court were able to draw an order which would provide a bright guideline between permissible and impermissible future conduct in this context, it would be willing to do so. I doubt, however, that bright lines are possible here. If possible, their drawing would, in any event, involve considerably more factual knowledge than this Court currently possesses about these two corporations and the metal plate connector market as a whole.

The alternative, of course, would be a generalized order restraining Microdot from acquiring any Elco stock unless and until it had made an irrevocable arrangement to divest itself of its metal plate connector business under such circumstances that neither its divestiture nor its acquisition of Elco stock thereafter may tend substantially

---

3. I assume for present purposes that Microdot's fears are well founded. There is currently no record basis for this assumption, however.

4. In connection with this contention, Microdot has consented to the entry of a permanent injunction in the form of its requested modification of the preliminary injunction.

to lessen competition in the metal plate connector market. Assuming that such an order would meet the requirement of Rule 65(d) that the acts sought to be enjoined be described "in reasonable detail," it would clearly leave much room for debate as to what acts it forbids. It may be doubted whether Microdot would be willing to exercise judgment under such a standard upon pain of contempt. Even if they were willing to do so, however, the entry of such an order over Elco's objection would be inappropriate. Elco's chance to debate the defendants' judgment would come only after a renewal of the tender offer and it would have the burden of discovering and marshalling the facts to demonstrate any anti-competitive effect. The practical effect of such an order would be to lift Microdot's present burden of demonstrating that any renewed approach to Elco would pose no possible antitrust problems, and to place the burden on Elco of demonstrating the presence of such problems.

In short, defendants attempted to acquire Elco through a tender offer for its stock. Based on the current record this Court determined that defendants' take over plan would violate the Clayton Act and that its tender offer, even though short lived because of the intervention of this Court, had caused substantial injury to Elco. Defendants now seek advance permission to renew their take over bid in the event they are able to arrange their affairs in some manner which they conclude will permit consummation of the take over without antitrust problems, leaving Elco with the burden of establishing any anti-competitive effects which the new bid might pose. In fairness, I conclude that the permission sought should not be granted. Under these circumstances, the defendants should bear the burden of showing that a specific proposal they wish to pursue can be consummated without encroaching on forbidden territory.

Submit order.