NORTHROP CORPORATION, Plaintiff,

v.

McDONNELL DOUGLAS
CORPORATION,
Defendant.

Civ. A. No. 79–4145–R.

United States District Court,
C. D. California.

Sept. 5, 1980.

Overton, Lyman & Prince, Peter Brown Dolan, Frederick A. Clark, Los Angeles, Cal., Crowell & Moring, Eldon H. Crowell, W. Stanfield Johnson, Washington, D. C., Sheppard, Mullin, Richter & Hampton, Don T. Hibner, Jr., William M. Elliott, Robert B. Watts, Jr., Northrop Corporation, Los Angeles, Cal., for Northrop.

Bryan, Cave, McPheeters & McRoberts, George S. Hecker, Robert F. Scoular, Charles A. Weiss, Francis M. Gaffney, Los Angeles, Cal., St. Louis, Mo., Kadison, Pfaelzer, Woodard, Quinn & Rossi, John J. Quinn, Richard K. Simon, Ellen B. Friedman, Los Angeles, Cal., for McDonnell Douglas.

## OPINION

REAL, District Judge.

Plaintiff NORTHROP CORPORATION (NORTHROP) filed suit complaining in eight causes of action of its First Amended Complaint that defendant McDONNELL DOUGLAS CORPORATION (MDC) has violated an agreement in which NORTHROP would have the exclusive sales rights of the F–18 aircraft of suitable configuration for land operation and MDC would limit its sales to F–18 aircraft that are "carrier-suitable." NORTHROP asks for injunctive relief and damages resulting from MDC's alleged (1) violation of this agreement; (2) misappropriation of NORTHROP's property; (3) fraud in the inducement of a Teaming Agreement and Basic Agreement; (4) attempt to monopolize the F/A–18A and the F–18L fighter aircraft market; and (5) unfair competition. In addition NORTHROP seeks a declaration of the respective rights of the parties under its Basic Agreement of June 27, 1975 with MDC, an accounting of the profits earned by MDC by reason of its fraudulent acquisition of NORTHROP's proprietary technology and breach of trust and recovery in quantum meruit for materials and services rendered to MDC for which NORTHROP has not been compensated.

MDC has moved to dismiss the First Amended Complaint on various grounds and alternatively moves for Summary Judgment. Each ground will be handled separately in this opinion although the lines between dismissal and summary judgment on the various counts may occasionally become somewhat blurred.

The Odyssey into this litigation begins in NORTHROP's Think Tank in 1965. In that year NORTHROP began development of a new lightweight supersonic fighter aircraft for purchase by the United States and sale in the international weapons system market. The design efforts produced a P–530 and P–630 aircraft concept in 1969 prompting the United States Air Force to under-

take an Air Combat Fighter, or "ACF," Program for prototype development of lightweight fighter aircraft.

NORTHROP submitted a proposal to the Air Force based upon its P–530 design and in 1972 was given a contract for a prototype ACF aircraft denominated the YF–17. NORTHROP was paid approximately 39 million dollars for its work on two prototype YF–17 aircraft. Simultaneously GENERAL DYNAMICS CORPORATION was awarded a prototype contract for its proposed YF–16. Both of these development contracts were limited to design of an airplane for land–based use. MDC did not enter the competition for Air Force research and development contracts relying on its own assessment that its F–15 and F–4 would adequately fill its competitive needs through the 1980s. Any development by MDC in the meantime was limited to improving the technology embraced within its F–15 design.

The United States Navy in 1973 had decided to develop a new lighter weight aircraft for its carrier fleet. Requested funding for what was to be named as the Navy Air Combat Fighter or NACF program[1] brought Congress to the realization that the development of individual technology between the various armed services utilizing aircraft was not cost efficient. By directive Congress required the Navy to make maximum use of the paid–for technology developed in the ACF program. With that kind of a stricture upon the Navy's development needs the data, technology and hardware of only two aircraft was available for use in the NACF competition i. e., NORTHROP's YF–17 and GENERAL DYNAMICS' YF–16.

In June 1974 the Navy published to the aerospace industry a pre–solicitation notice with a set of requirements for its NACF competition. Congress had severely limited Navy funding to supplementing YF–16 and YF–17 technology and so the Navy was required to look to what a MDC executive described as the only "crap game in town."

---

1. This program started with the acronym VFAX. It was later changed to NACF. For the purposes of clarity the entire program will be referred to by its last acronym: NACF.

What the Navy faced was a crap game in which the two potential participants did not know how to play. As a way out of its dilemma the Navy used its persuasive abilities to convince both NORTHROP and GENERAL DYNAMICS to look to a partnership with some aircraft manufacturer that had experience in the design, development and manufacture of carrier–suitable aircraft. This brought on the industrial courtship and marriage of NORTHROP and MDC. Who was the pursued and who the pursuer is disputed by the parties. The undisputed fact is a neutral view that they desperately needed each other if they–jointly and severally–were to succeed in tapping the great potential of the opportunity presented by the Navy's need for a new aircraft to meet the military seapower needs of the nation.

On October 2, 1974 NORTHROP and MDC executed a Teaming Agreement "to team for the purpose of developing, proposing and producing a USAF derivative of the YF–17 (USAF ACF) and a carrier–suitable version of the YF–17 (USN ACF) to satisfy U. S. Navy VFAX requirements." This agreement by its own terms was to terminate on June 30, 1975 unless mutually extended.

The team effort had a dual purpose. It was to be a joint effort of NORTHROP and MDC to successfully design fighter aircraft for both the Navy and Air Force utilizing derivatives of the YF–17 technology developed by NORTHROP. To fulfill the obligations of the Teaming Agreement NORTHROP pursued the Air Force ACF competition while MDC turned its efforts to the design responsibilities involved in the Navy NACF program.

As competition goes there are winners and losers. In January 1975 NORTHROP found itself losing the Air Force ACF competition to GENERAL DYNAMICS. MDC was notified on May 2, 1975 that it had won the Navy NACF competition. This latter event was the birth of the F–18.

In what has been denominated the "Basic Agreement" executed June 27, 1975 the parties agreed:

3. Contract Responsibilities

(a) ... that MDC will be prime contractor in connection with contracts with the U. S. Navy for the development of the F–18 and for the production of those F–18 aircraft purchased by the U. S. Navy for its own use. Furthermore, in the event a foreign customer desires to procure from MDC ... F–18 aircraft of basically the same configuration ... MDC will be prime contractor ...

(b) NOC may elect to be prime contractor on any or all contracts for the development and production of aircraft derived from the NOC YF–17 other than those referred to in paragraph (a) above.

It is this market sharing provision that underlies the present disputes between NORTHROP and MDC.

The Basic Agreement mutually obligated MDC and NORTHROP to exchange design, design analysis and test data on the F–18 and YF–17 technology. The parties made clear that the relationship created was not "in any manner intended to create a joint venture or otherwise incur or imply joint or several liability."

In answer to the award of the Navy NACF competition to the MDC–NORTHROP team the government awarded a prime contract in excess of $1.063 billion dollars to MDC to fully design and develop the aircraft–the F–18. NORTHROP was awarded a subcontract by MDC requiring NORTHROP to provide "personnel, materials, services, facilities, logistics support, data and management required to design and develop, fabricate, qualify, test, document and deliver the ... F–18 major assemblies/equipment in accordance with MACAIR Statement of Work (SOW) No. WS–F–18–27."

New vigor had been infused into the NORTHROP YF–17 effort. In late 1975 and early 1976 it began an effort to interest the Shah of Iran in becoming the first customer of a YF–17 derivative day fighter. The Navy's concern that NORTHROP's Ira-

nian effort might dilute its own F–18 development prompted a new agreement between MDC and NORTHROP on August 26, 1976.

The agreement of August 26, 1976 reaffirmed the June 27, 1975 agreement. It also provided that NORTHROP "has elected to design, develop and produce for sale to the United States and to foreign governments all aircraft designed only for land–based operations which are derived from the YF–17." This election was in answer to the demands of the Navy that the parties agree upon a Foreign Military Sales (FMS) Master Plan. It also assured the Navy that NORTHROP's development of a day fighter would not interfere with the design and development of the now designated Navy's F–18–A.

The design of the F–18 now completed and ready for production, MDC turned to new markets to make sales. These market efforts involve on–going presentations in what NORTHROP claims are violations of the Basic Agreement between the parties to Canada, Israel, Spain and Australia. Perceiving that its claimed exclusive position in furnishing land based F–18s to the world market was about to evaporate with MDC's successful effort in Canada, NORTHROP filed suit and in its First Amended Complaint alleges eight causes of action variously described as acts of fraud, systematic breaches of contract, wrongful economic coercion, concerted refusals to deal, unfair competition and industrial espionage.

Both parties make extravagant claims as to its own contribution to development of the F–18. Although the truth may lie somewhere between these claims, this Court need not make that determination to dispose of the motions before it.

MDC has now moved for dismissal on the grounds that 1.) there is a failure to join an indispensable party i. e., the United States; 2.) the court lacks subject matter jurisdiction; 3.) failure to state a claim upon which relief can be granted because of nonjusticiable political and foreign policy questions exclusively within the jurisdiction of the executive and legislative branches of government; and 4.) NORTHROP fails to state a claim upon which relief can be granted under Sec. 2 of the Sherman Act.

MDC also asks for summary judgment on the grounds that 1.) the relief requested in the First, Second, Third, Sixth and Seventh causes of action would constitute an illegal restraint of trade in violation of Secs. 1 and 2 of the Sherman Act. NORTHROP cannot establish injury in fact in its Fourth, Fifth, Sixth, Seventh and Eighth causes of action.

## 1. FAILURE TO JOIN AN INDISPENSABLE PARTY–THE UNITED STATES GOVERNMENT

Federal Rules of Civil Procedure Rule 19 provides:

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest . . .

(b) Determination by Court Whenever Joinder not Feasible.

If a person . . . cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the Court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided;

third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

MDC claims the application of Rule 19 F.R.Civ.P. because of NORTHROP's allegations that the disclosure of data and technology–particularly by NORTHROP to MDC–created a license limiting MDC's right to use the data and technology in its sales efforts of F–18 design aircraft not "carrier–suitable." In essence MDC urges that to successfully maintain such a claim the Court must necessarily decide that NORTHROP has proprietory rights which derogate both the rights of MDC and the United States government in whatever data and technology NORTHROP disclosed to MDC. The rights of the United States Government and, derivatively of MDC are claimed to be created pursuant to Armed Services Procurement Regulations (ASPR),[2] as "law binding on the parties in a Government contract ..." *ITT Arctic Services, Inc. v. United States,* 524 F.2d 680, 690 (Ct.Cl.1975).

There is no dispute between the parties that the YF–17 data and technology developed by NORTHROP was in fulfillment of its obligations under a government contract. The ASPRs[3] clearly give the United States Government unlimited rights in the YF–17 data and technology. The fluidity[4] of NORTHROP's argument does not change the fact that NORTHROP's YF–17 contract with the United States Government incorporated the ASPRs applicable to the very rights in data and technology NORTHROP now claims MDC is misappropriating.

■ Procurement of the design, development and production of weapons systems for the defense of the nation is a governmental function peculiarly left to an amalgam of executive and legislative powers. In the exercise of those plenary powers the Government–subject only to self–imposed limitations–has the right to designate the who, what, when and where of weapons system production. When that right can be called into question by a Court in what cosmetically[5] is a dispute between private parties, the United States Government comes within the considerations of indispensability delineated by Rule 19 F.R.Civ.P.

■ Dismissal does not, however, become automatic because the United States Government's rights in the data and technology surrounding the development of the F–18 is inextricably bound up with the private dispute between NORTHROP and MDC. Dismissal is proper only when a judgment may be prejudicial to the rights of the absent person or to those already parties before the Court. Another consideration is whether a judgment can be shaped to provide relief for a complaining party minimizing or eliminating the prejudice. The adequacy of the remedy available without the absent person is a third considera-

---

2. These regulations have recently been redesignated Defense Acquisition Regulations (DAR) and will be used herein interchangeably.

3. See particularly ASPR § 9–202.2(b) (June 1979); § 9–201(b) (July 1976); § 9–201(d) (July 1976); § 7–104.9 (March 1979); § 7.104.9(a) (August 1969); § 7.104.9(a), (b)(2) (April 1972); § 9‑202.3(b)(2) (June 1979).

4. At one point counsel for NORTHROP advises the Court
   a. December 3, 1979–"The Government did not ... obtain the P–530, P–630 data from NORTHROP."
   b. December 3, 1979–"The United States Government didn't buy that original design and has recognized NORTHROP's right in it."

On the other hand NORTHROP asserts
   a. "NORTHROP does not allege-for the purposes of this action- that the Government does not have unlimited rights to use YF–17/F–18A technical data;" NORTHROP's Memorandum of Points and Authorities In Opposition to Motion to Dismiss And for Summary Judgment. p. 94.

5. NORTHROP continually argues that "... NORTHROP has no claim against, and seeks no relief directly or indirectly from, the Government." This argument completely ignores that the consideration of NORTHROP's rights and the impact upon the claimed rights of MDC *and* the United States Government allegedly created by contracts for development of the F–18.

tion. A fourth concern of the Court is the availability of an adequate remedy to the complaining party if the action is to be dismissed for nonjoinder.

■ NORTHROP disclaims the necessity of joinder of the United States Government by assertions that the fashioning of NOR-THROP's requested relief is simply not dependent upon determination of the rights of the United States Government. The assertions fall short of the uncontroverted facts. Any injunctive relief against MDC as prayed by NORTHROP necessarily limits the United States Government in its F–18 procurement activities.[6]

NORTHROP urges as controlling authority the decision in *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92 (D.C. Cal. 1971), aff'd on the District Court's opinion 461 F.2d 1261 (9th Cir. 1972), cert. denied, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972). If NORTHROP depends upon Occidental Petroleum the dependence is totally misplaced. Judge Pregerson in deciding the indispensable party issue does no more than apply the general rules governing Rule 19 joinder to the facts of the case. Although helpful in that analysis it does not address the issue here where the interest of the United States Government subsumes the very subject matter of the action i. e., data and technology surrounding the F–18 development contracts. Without determination of United States Government derivative rights and the so-called derivative "flow–down rights"[7] claimed by MDC no meaningful relief can be given by this Court.

■ The relief claimed by NORTHROP impinges upon the United States Govern-

ment defense procurement policies in yet another important respect. The United States Government has plenary power in the conduct of foreign relations. It alone decides who will provide weapons systems, data and technological know–how to foreign governments.[8] NORTHROP would have this Court order that the *ONLY* entity that could provide the source of data and technological assistance for land–based F–18 aircraft for either FMS[9] or licensed commercial sales abroad is NORTHROP. Concomitantly MDC is the *ONLY* authorized source for carrier–based F–18 data and technological assistance.

NORTHROP attempts to pigeon–hole each of the aspects of relief urging on the Court that declaratory relief and damages would leave unencumbered the government interests in F–18 data and technology. Without real analysis that simplistic suggestion has much appeal. What it lacks is substance. NORTHROP claims that MDC is breaching their agreement by disclosing to potential foreign buyers F–18 data and technology that NORTHROP provided to MDC. This approach mixes the license and business opportunity theories pressed by NORTHROP.[10] However, no disclosure can be made in connection with the sales activity involving military data or technology without an express approval of an appropriate United States Agency. What is required is the determination of whether an exporter of data or technology acts as an agent of the government because of the pervasive statutes and regulations controlling the exporter. This is particularly critical if, as in the case here, the exporter is a government contractor for the very data or

---

**6.** NORTHROP's position is that the United States Government can procure land–based F–18's *ONLY* from NORTHROP and carrier-based F–18s *ONLY* from MDC.

**7.** DAR § 7–104.9(a) and DAR § 9–202.2. The extent of "flow–down" cannot be determined without interpretation of the United States interests in the contracts for development of the F–18.

**8.** See: Foreign Assistance Act, 22 U.S.C. § 2151 et seq.; International Security Assistance and Arms Export Control Act, 22 U.S.C.

§ 2751 et seq.; International Traffic in Arms Regulations.

**9.** Foreign Military Sales are made directly by the United States to foreign nations pursuant to mutual assistance and foreign policy considerations.

**10.** These theories evoke vehement protestations from each side that the F–18 is the result of their singular genius. The dispute need not be resolved to decide these motions.

technology being exported. If that question lends itself to resolution in favor of MDC, then it is clear that NORTHROP's exclusive remedy is against the United States pursuant to 22 U.S.C. § 2356(a)(2)(A) or. (b). Whatever the outcome of such a consideration, the interest of the United States Government is very much in issue.

The United States Government is both necessary and indispensable to the equitable and just determination of the controversy framed by the allegations of NORTHROP's First Amended Complaint.

## 2. SUBJECT MATTER JURISDICTION

■ MDC claims that the application of 22 U.S.C. § 2356, 10 U.S.C. § 2273 and the Tucker Act effectively defeat the subject matter jurisdiction of the Court over the complaints of NORTHROP.

### a. 22 U.S.C. § 2356

In its pertinent part 22 U.S.C. § 2356 provides:

(a) Whenever, in connection with the furnishing of assistance under this chapter—

(1) * * *

(2) information, which is (A) protected by law, ..., is disclosed by the United States Government or any of its officers, employees, or agents in violation of such restrictions,

the exclusive remedy of the owner ... is to sue the United States Government for reasonable and entire compensation for such practice or disclosure ...

NORTHROP focuses on disclosure "by the United States Government" as the controlling language of § 2356. NORTHROP then argues that MDC and not the United States Government is disclosing and threatening to disclose F–18 data and technology in its sales efforts abroad. The argument glosses what must be the real concern of this Court.

Section 2356 has alternate iterations fixing liability on the United States Government. This provision is "the exclusive remedy of the owner" when either "the United States Government or any of its officers, employees, or *agents*" (emphasis added) make the disclosure of protected information. The question of the United States Government's clear agency in FMS sales and its, at least putative, agency relationship in the licensing of commercial sales permissible only in the best interest of United States foreign policy can only be clarified in an action brought pursuant to 22 U.S.C. § 2356.

### ■ b. 10 U.S.C. § 2273

Subsection (b) of 10 U.S.C. § 2273 provides:

(b) Any person who believes that—

(1) a design developed by him after July 2, 1926, relating to aircraft or an aircraft component, is being used; or

(2) an article embodying a design developed by him after July 2, 1926, relating to aircraft or an aircraft component, is being used or manufactured; by or for the United States without just compensation to him from the United States or any other source may, ... sue in the Court of Claims to recover reasonable and entire compensation.

Again NORTHROP has alleged claims that come within the reaches of 10 U.S.C. § 2273. There is no question that NORTHROP's suit *against the Government* cannot be pursued in this Court under § 2273(b). MDC's claim of exclusivity apparently derives from the concluding language of § 2273 providing the claimant with "reasonable and entire compensation."

Although § 2273 provides for entire compensation it asks too much to interpret that language as creating an exclusive remedy. Nothing in the legislative history. indicates a desire or intent toward exclusivity. Recognizing that treating §.2273 as a parallel avenue of recovery may cause some problems of judicial coordination the logistics are neither novel nor impossible. A party pressing suit alternatively against the government in the Court of Claims under § 2273 and in this Court on theories of misappropriation can recover only once to be made whole. Courts are equipped to

deal with such eventualities and are capable, with the help of vigilant parties, to assure that no double recovery may be had by the injured party.

c. The Tucker Act 28 U.S.C. § 1346(a)(2); 28 U.S.C. 1491

For the same reasons that 10 U.S.C. § 2273 does not defeat the jurisdiction of this Court no prolonged discussion of the contractual relationship between the United States Government and NORTHROP need be undertaken.

### 3. NON–JUSTICIABLE POLITICAL QUESTIONS AND THE ACT OF STATE DOCTRINE

a. Non–Justiciable Political Question

MDC asserts that NORTHROP's claims require this Court to enter the political question arena in contravention of the prohibition of *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

The Supreme Court in *Baker* (supra) made clear the distinction between jurisdiction in a subject–matter sense and justiciability of the subject matter. It says at 198, 82 S.Ct. at 700

> ... The distinction between the two grounds is significant. In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not "arise under the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, § 2), or is not a "case or controversy" within the meaning of that section; or the cause is not one described by any jurisdictional statute.

■ Giving the nonjusticiable portion of the distinction the appellation "political

question," the Court then proceeds to provide the considerations for determination of nonjusticiability. Alternatively they are:

1. A textually demonstrable constitutional commitment of the issue to a coordinate political department; or

2. Impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

3. Impossibility of a Court's understanding independent resolution without expressing lack of the respect due coordinate branches of government; or

4. An unusual need for unquestioning adherence to a political decision already made; or

5. The potentiality of embarrassment from multifarious pronouncements by various departments on one question.

■ Stripped of all of the rhetoric by both parties in pursuit of their independent interests what NORTHROP asks this Court to decide is WHO will be the exclusive builder (prime contractor) for the carrier–suitable or land–based versions of the F–18 weapons system. NORTHROP would in effect make this Court the super–procurer and sales licensor of a military weapons system. Considerations of the separation of powers and of the complex statutory structure relegating to the Executive Branch of the United States the concerns for the military arsenal–its development, procurement and deployment–bring this case within the political question considerations delineated in *Baker v. Carr* (supra).

b. ACT OF STATE DOCTRINE

The reticence of United States Courts to intervene in private actions when an act of state [11] is involved finds its fountainhead in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897) when the Supreme Court expressed the doctrine in this manner:

> Every sovereign state is bound to respect the independence of every other sover-

---

11. An "act of state" is an executive or administrative exercise of foreign power by an independent State.

eign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory.

The judicial policy considerations of *Underhill* were reaffirmed with an exhaustive review of the intervening authorities in *Banco Nacional De Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). In *Sabbatino* the Supreme Court expressed the constitutional underpinnings of the Act of State Doctrine and explained its reasoning as arising out of the constitutional separation of powers giving the Executive Branch of government the obligation to protect the interest of United States citizens in their relationship with foreign governments.

■ MDC urges the Act of State Doctrine be applied to the claims of NORTHROP particularly because both NORTHROP and MDC would be compelled to inquire into the actions of the governments of Australia, Canada, Germany, Greece, Israel, Korea, Spain, Turkey, and the United Kingdom in establishing that the alleged acts charged against MDC are causally connected to the failure of NORTHROP to accomplish F–18 sales in these countries.

If MDC is correct in its assertion– and anti–trust precedent supports MDC [12]–this Court would be required to inquire into sensitive questions of vital concern of the military security of those foreign governments in which NORTHROP claims MDC's acts thwarted its sales efforts. *Underhill* and *Sabbatino* compel dismissal. The Ninth Circuit views of the Act of State Doctrine in *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92 (D.C. Cal. 1971), and *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1976) are not in conflict with such a decision. The Sherman Act discussion to follow should make clear that even if *Timberlane* cannot

be factually distinguished [13] the antitrust concerns are probably non–existent as an offsetting concern.

4. ILLEGAL RESTRAINT OF TRADE–SHERMAN ACT SECTION 1

■ MDC has moved for summary judgment on NORTHROP's First, Second, Third, Sixth and Seventh causes of action because it asserts that the agreements upon which these causes of action depend constitute an illegal allocation of markets in violation of the Sherman Act Section 1. MDC claims that this clear division of markets–carrier–suitable F–18s to MDC and land–based F–18s to NORTHROP–comes within per se declarations of violations of the Supreme Court in antitrust cases.

NORTHROP urges that the agreement is not in restraint of trade but rather enhances competition. NORTHROP further urges that the restraints imposed by the Basic Agreement are subject to a rule of reason analysis that can be made only after a full trial of the case. The rule of reason argument is pressed because of NORTHROP's claim of uniqueness of the industry concept embodied in the MDC–NORTHROP relationship and its alleged horizontal–vertical aspects.

On both scores NORTHROP is wrong. There is no vertical relationship alleged, shown, or that can be shown between MDC and NORTHROP to invoke the reasoning of *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). NORTHROP and MDC are horizontal competitors competing in the market place for weapons systems sales. The agreements themselves are eloquent evidence of the absence of any vertical aspect of the relationship. The Teaming Agreement is simply that–a joint effort to obtain

---

**12.** See *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Salerno v. American League of Professional Baseball Clubs*, 429 F.2d 1003 (2d Cir. 1970), cert. denied 400 U.S. 1001 (1971), both cases construing pleading of the "by reason of" provision of the Sherman Act.

**13.** *Timberlane* (supra) involved a judicial determination of a mortgage dispute. Here we are concerned with one of the most vital concerns of a sovereign–its military arsenal and the decision affecting it.

a design contract in the U. S. Navy NACF competition. The Basic Agreement specifically eschews a joint venture or other relationship creating joint and several liability.

NORTHROP's enhancement of competition theory, because somehow or other "carrier–suitable F–18A and NORTHROP's land–based F–18L have been keen, head to head competitors in every international competition" is totally untenable. The testimony concerning competition is belied by two irrefutable facts–1. A land–based F–18 design cannot be sold by NORTHROP to the U. S. Navy–or for that matter to any navy in the world.[14] 2. NORTHROP's own position in this litigation is that MDC is offering the land–based design in violation of the Basic Agreement.

NORTHROP's "unique industry context" theory suffers an even greater defect that is not cured by the affidavit of Dr. Almarin Phillips. The activity that is at issue here is the *sale* of F–18 aircraft. The sophistication of the technology and the complexity of the requirements for production do not change the simple principles of marketing products taught in basic marketing courses or learned by the experience of selling any product subject to the scrutiny of a discerning buyer.

As appealing as the rule of reason argument of NORTHROP is to this Court, the undisputed facts of this case and the simple interpretation of the language of the Basic Agreement bring this case clearly within the per se illegality defined by the Supreme Court in *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

One more contention of NORTHROP must be disposed of before we leave the restraint of trade aspect of this litigation. NORTHROP claims validity of the market division provided in the Basic Agreement as an ancillary restraint attached to the licensing of some undefined and amorphous YF–17 data and technology. NORTHROP's aim misses the mark. There is no data or

technology licensed to MDC. MDC does not derive its right to build an F–18 weapons system (carrier–based) from any license agreement with NORTHROP. The Teaming Agreement was one required by the United States Government and NORTHROP was paid for any manner of its participation or disclosures in that joint effort. MDC obtained its abilities to build and sell F–18 weapons system from its participation in the NACF competition with the proprietary rights that neither reserved but did obtain as the result of that participation. Ancillary restraints under these circumstances are not tolerated in such transactions particularly when they take on the per se characteristics of division of market.

## 5. ATTEMPT TO MONOPOLIZE–SHERMAN ACT SECTION 2

The Sherman Act Section 2, 15 U.S.C. § 2 (Supp. 1980), provides:

> Every person who shall . . ., attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . .

In *American Tobacco Company v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946) the United States Supreme Court first approved the definition of attempt to monopolize as follows:

> The phrase 'attempt to monopolize' means the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it, which methods, means and practices are so employed . . . for the purpose of such accomplishment.

Monopolization in that context was given a meaning limited to the power to exclude competitors or to fix prices in a relevant market.

---

**14.** It takes little expertise to recognize that a land–based design F–18 simply cannot be used for aircraft carrier launch and landing procedures without making it a carrier–suitable aircraft.

NORTHROP's allegations and arguments in support of its attempt to monopolize claim are again somewhat vague. It claims in essence only that the issue requires trial. This Court is aware of the admonition of *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). To read Poller as a prohibition to summary judgment in antitrust cases over-reaches the language that it should be "used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." Poller at 473, 82 S.Ct. at 491. When material facts are not in dispute and only questions of law remain to be resolved, trial courts should not be reluctant to make prompt disposition of matters without penalizing the parties with long and expensive pre–trial practices that would lead to the same result.

Attempt to monopolize cases are peculiar because they, even more than merger cases, deal in probabilities of success in the market delineated by the product and the geographic marketing capabilities of the producers.

The peculiarity is exacerbated by the very purpose of competition. Competition to be effective requires that the participants "attempt" to sell all of the product they can produce to the exclusion of competitors in the same product and geographic market. The antitrust laws were enacted not to protect competitors but rather to assure free and aggressive competition in the market place of "trade or commerce among the several States, or with foreign nations." NORTHROP's arguments are all competitor–protective oriented. What is disturbing is that traditional considerations of competition and commerce do not adequately answer the concerns of the Court in the analysis of F–18 sales activity.

No one could contest that the product market of concern to the Court is F–18 weapons systems. Some argument can be made that submarkets ought to be recognized in F–18 aircraft configured for land–based activities and those suitable to seagoing aircraft carrier deployment. Geographically, the world is arguably the market place. Certainly included would be those reaches of the world market encompassing nations with the wealth capacity and the use capability needed for consideration of the use of F–18 weapons systems.

The concern of product and geographic market from the traditional antitrust viewpoint become unimportant here for one very basic reason. The United States Government has the absolute and over–riding control of both the production and sales potential of the product that brings these parties into vitriolic conflict.

What strikes the Court under such circumstances is that there is not the "trade or commerce among the several States, or with foreign nations" essential to antitrust concerns of monopolization including the critical inquiry here–attempt to monopolize. The United States Government *is the market* [15] concerned with production and distribution of weapons systems for governmental military establishments. As such, this differs from the basic thrust of antitrust laws applicable to governmental procurement practices in competition with consumer enterprises buying goods generally available in the marketplace.

The United States Government also makes the world market. No single group of producers has any power to expand a market share beyond that considered by the United States Government in the implementation of domestic defense and foreign policy which is in the best interest of its citizens.

Political considerations aside, the monopoly, if any, enjoyed or threatened by MDC is a governmental creation outside the reaches of the Sherman Act Section 2.

**15.** The Foreign Assistance Act, 22 U.S.C. § 2151 et seq.; International Security Assistance and Arms Export Control Act, 22 U.S.C. § 2751 et seq.; and International Traffic in Arms Regulations comprehensively give the government plenary power in military procurement practices.

NORTHROP cites *Ovitron Corp. v. General Motors Corp.*, 295 F.Supp. 373 (S.D. N.Y. 1969) *(Ovitron I)* as support for the application of the Sherman Act to governmental procurement activities. *Ovitron I* is distinguishable. The Court there was concerned with a very clear charge of predatory pricing. More importantly *Ovitron I* does not reach the issue presented here i. e., the impact of the government's absolute ability to make the market. NORTHROP in a motion to correct the record has gone outside of the record upon which the Court in Ovitron made its decision. But even taking all of the facts NORTHROP would now have this court consider in reading the decision in *Ovitron I*[16] the result would not change. *Ovitron Corp. v. General Motors Corp.*, 364 F.Supp. 944 (S.D. N.Y. 1973) *(Ovitron II)* suggests the impossible task NORTHROP would have in proving antitrust damage. To prove such damage NORTHROP would have to show that it would be the successful ·bidder in the procurements it alleges have been frustrated by MDC's conduct. Aside from the political question and act of state problems already disposed of in this opinion NORTHROP still faces the task of showing that the United States Government would turn to it for its F–18 needs. The only way this Court can ·conceive that it could be done would be to show an *absolute* need of F–18 weapons systems by the United States and its chosen allies in military procurement. Added to the *absolute* need would be this Court's award of NORTHROP's prayed for relief giving it the *exclusive* right to bid the F–18 weapons systems apportioned to it by the Basic Agreement. In light of the disposition made of the restraint of trade issue herein that cannot come to pass.

## CONCLUSION

1. MDC's motion to dismiss the complaint because of the failure to include an indispensable party is granted.

2. MDC's motion to dismiss the complaint for lack of subject matter jurisdiction [22 U.S.C. § 2356] is granted.

3. MDC's motion to dismiss the complaint for lack of subject matter jurisdiction [10 U.S.C. § 2273 and The Tucker Act 28 U.S.C. § 1346(a)(2) and § 1491] is denied.

4. MDC's motion to dismiss the complaint for failure to state a claim (nonjusticiability and Act of State Doctrine) is granted.

5. MDC's motion for summary judgment on the First, Second, Third, Sixth and Seventh causes of action (illegal restraint of trade–Sherman Act Sec. 1) is granted.

6. MDC's motion for summary judgment on the Sixth cause of action (attempt to monopolize Sherman Act Section 2) is granted.

---

**16.** The additional fact NORTHROP asks this Court to consider is that the radios which was the product involved were on the Munitions List. The assumption of that fact would not change the reasoning herein.