**GRUMMAN CORPORATION, Plaintiff,**

v.

**The LTV CORPORATION, CKH Corporation, Jones & Laughlin Industries, Inc., and Vought Corporation, Defendants.**

No. CV 81 3156.

United States District Court, E. D. New York.

Oct. 14, 1981.

Cahill Gordon & Reindel, New York City, for plaintiff; Raymond L. Falls, Jr., David R. Hyde, Immanuel Kohn, William T. Lifland, Dudley B. Tenney, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendants; Henry L. King, Bartlett H. McGuire, Arthur F. Golden, Paul R. Koepff, Andrew C. Jacobs, William L. Rosoff, David W. Ferguson, New York City, of counsel.

*Memorandum of Decision*

MISHLER, District Judge.

Plaintiff Grumman Corporation ("Grumman") instituted this action on September 28, 1981 to enjoin, *inter alia*, its acquisition by CKH Corporation, an indirect wholly-owned subsidiary of the LTV Corporation, which had four days earlier commenced a tender offer for the common stock, convertible preferred stock and convertible subordinated debentures of Grumman representing or convertible into an aggregate of 70% of Grumman's outstanding voting shares. The proration date and the date upon which withdrawal rights expire is 12:01 a. m., October 16, 1981.

Plaintiff moved for a preliminary injunction which this court made returnable on October 6, 1981. Based upon the evidence adduced through the testimony offered at the two-day hearing, the affidavits, the depositions and the exhibits offered in conjunction therewith, plaintiff attempted to establish its right to preliminary relief based upon Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Sections 14(d) and 14(e) of the 1934 Act, 15 U.S.C. §§ 78n(d) and 78n(e), and the rules and regulations promulgated thereunder. Because we believe that plaintiff has satisfied the standards for a preliminary injunction, its motion must be granted.

## I. *The Parties*

Grumman is a New York corporation, and, as is pertinent to the instant antitrust claim, is engaged in the business of designing and producing military aircraft, space

systems and commercial aircraft component subassemblies.[1] The LTV Corporation ("LTV") is a Delaware corporation as is its subsidiary, Vought Corporation ("Vought"), through which LTV is engaged in business in the aerospace industry. In the past twenty years Vought and Grumman have been formidable competitors in the design, development and production of military aircraft, commercial aircraft components and subassemblies as well as other aerospace products.

## II. The Antitrust Claim

▮▮▮ The initial question for consideration is whether the acquisition by LTV (through its subsidiary CKH Corporation) of the stock of Grumman "may be substantially to lessen competition, or tend to create a monopoly" in the design, production and sale of various aerospace products within the meaning of Section 7 of the Clayton Act. That statute, which was "designed to arrest in its *incipiency* . . . the substantial lessening of competition" due to the takeover of one company by another, *United States v. E. I. duPont de Nemours & Co.,* 353 U.S. 586, 589, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057 (1957) (emphasis added), provides:

> No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital . . . of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

The first inquiry made in any Section 7 case is, of course, into market definition, i. e., the determination of the relevant lines of commerce. *See United States v. Aluminum*

*Company of America,* 377 U.S. 271, 273, 84 S.Ct. 1283, 1285, 12 L.Ed.2d 314 (1964). Only after defining the scope of the market can the court determine which parties are competitors and whether competition might be lessened. We lament only that our task is not so easy as our understanding of what our task is.

### A. Relevant Markets

The antitrust claims involve alleged horizontal competition in three claimed separately cognizable markets for purposes of Section 7: carrier-based aircraft sold to the United States Navy,[2] airframe subassembly contracting and nacelles (the structure and the hydraulic fuel and electrical systems that surround and enclose aircraft engines). LTV takes the position that none of the aforementioned product categories constitute relevant markets or submarkets. Instead, LTV appears to suggest that only two markets are appropriate for our present purposes: military aircraft and commercial aircraft.

The factors generally used for the determination of relevant product markets were identified by the Supreme Court in *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). We believe the indicia of separate submarkets as outlined in *Brown Shoe* are also sensibly applied here.

The Supreme Court has instructed us that although "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," that market may be composed of various well-defined submarkets for antitrust purposes. *Brown Shoe Co. v. United States,* 370 U.S. at 325, 82 S.Ct. at 1523–24. Prior to suggesting how those submarkets should be identified, the Court noted that a merger

---

1. Plaintiff is also engaged in designing and producing a host of other products which are associated with industry segments other than the aircraft and space industry.

2. Grumman contends that separate submarkets exist for Navy attack carrier-based aircraft and

Navy fighter carrier-based aircraft. After considering the record in light of the factors set out in *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), we fail to find the existence of such separate submarkets.

"must be functionally viewed in the context of its particular industry." *Id.* at 322, 82 S.Ct. at 1522. It is with this perspective that we set out in our effort to define the relevant market(s) with the aid of the various "practical indicia" identified by the Court: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors." *Id.* at 325, 82 S.Ct. at 1524.

### 1. Carrier-Based Aircraft

■ We note at the outset that another court has recently found that comparable models of land-based aircraft and carrier-based aircraft constitute different submarkets. *See Northrop v. McDonnell Douglas Corp.*, 498 F.Supp. 1112, 1122 (C.D.Cal.1980). After considering each of the *Brown Shoe* factors we come to the same conclusion.

### a. Products' Peculiar Characteristics

The cross-elasticity of demand between the two products for use on an aircraft carrier is nonexistent. Relative to land-based aircraft, the carrier-based aircraft must have superior handling characteristics at low speeds, must be able to withstand greater landing impact and longitudinal stress, and must be able to endure more severe weather conditions. While other differences do exist, we need not address them since it is clear that land-based aircraft are not suited for the same uses as carrier-based aircraft.

### b. Industry and Navy Recognition of the Submarket as a Separate Economic Entity

Evidence presented at the hearing established that the aerospace industry distinguishes between the two types of aircraft in terms of the products and *their producers*, i. e., the industry recognizes an aircraft is not carrier-suitable unless manufactured by a company with experience in manufacturing carrier-based aircraft. Such recognition derives from the Navy's unwillingness to award contracts to manufacturers without such experience or without the assistance of a manufacturer having such experience. The evidence on this point was overwhelming and included testimony given by William Thayer, Chief Executive Officer of LTV, who, though he disputed the basis for such a posture, acknowledged that the Navy only considers an aircraft carrier-suitable if manufactured by a company that has, or is associated with a manufacturer that has, such experience.

Clearly, even more important than that industry recognition in this instance is consumer recognition. The Navy defines the market for carrier-suitable aircraft. As stated by Judge Real in *Northrop v. McDonnell Douglas Corp.*, 498 F.Supp. at 1123:

> "The United States Government *is the market* concerned with production and distribution of weapons systems for governmental military establishments. As such, this differs from the basic thrust of antitrust laws applicable to governmental procurement practices in competition with consumer enterprises buying goods generally available in the marketplace. The United States Government also makes the world market. No single group of producers has any power to expand a market share beyond that considered by the United States Government in the implementation of domestic defense and foreign policy which is in the best interest of its citizens."

(emphasis supplied in original).

The Navy's perception of competent producers as consisting only of those with carrier-based aircraft experience, or those having the benefit of the advice of such manufacturers, is most significant in defining the market. Whether the Navy's perception is justified is irrelevant.

Each of the other *Brown Shoe* indicia also point to a finding of a separately cognizable submarket in carrier-based aircraft which we find to be a relevant market.

### 2. Major Airframe Subassemblies

Plaintiff produced impressive evidence at the hearing on the existence of a submarket

in the subcontracting of major airframe assemblies for large civil aircraft in the form of testimony from Mr. R. Dixon Speas, an aviation consultant for thirty years. Without offering any expert testimony to the contrary, LTV asserts that since subcontractors simply perform the work that prime contractors choose not to perform, but could perform and sometimes do perform, the relevant market is composed of both subcontractors and prime contractors.[3] However, the expert testimony was to the effect that the primes are *not* capable of constructing *all* portions of their major airframe assemblies (the fuselage, the wings and the empennage) in house.

The prime contractors for major modern transport aircraft built in this country, Lockheed, McDonnell Douglas and Boeing, find it necessary to subcontract major airframe subassemblies in order (1) to avoid building up large labor forces which would be left without work after the run of a given aircraft was ended and (2) to share the financial responsibility for production until the aircraft is delivered and payment thereon made. These economic considerations require and create a market for subcontractors. Neither Lockheed, McDonnell Douglas nor Boeing is included in the market because their practice is not to subcontract major airframe assembly parts to competing prime contractors or to compete in the subassembly market.

The expert testimony further indicated that the three major primes are, of course, very particular with respect to which companies they will subcontract. Mr. Speas testified as to the existence of only seven companies with the capability and expertise to compete in this submarket (Grumman, Vought, AVCO, Fairchild, General Dynamics, Northrop and Rockwell), with Vought regarding itself as "Number One!" in subcontract programs. LTV failed to offer expert testimony to challenge or otherwise undermine the testimony of Mr. Speas which identified the subcontracting market for major airframe subassemblies for mili-

tary aircraft as a separate market because of the different customers and different aircraft requirements.

 The application of the *Brown Shoe* practical indicia, based upon the evidence in the record, and most significantly, based upon the expert testimony presented at the hearing, persuades us as to the existence of a submarket for subcontracts of large structural subassemblies of major civil aircraft.

### 3. Nacelles

Nacelle subassemblies are the structure and hydraulic, fuel and electrical systems that surround and enclose aircraft engines. The nacelle may be assembled in some instances together with pylons (which attach the engine assembly to the wing or fuselage) or thrust reversers (mechanical assemblies used to reverse the aircraft engine thrust on landing) or both. While the size of the nacelle subcontract market measured by annual sales presently ranges from $350 million to $500 million, substantial growth is forecast for future sales. Vought's 1982–1996 Strategic Plan indicated sales of up to $2.7 billion in 1996 for nacelles which is largely attributable to "the demand for fuel efficient transportation in the form of advanced technology aircraft and the reengining of older aircraft with newer fuel-efficient engines." LTV's claim of limited future opportunity in this market is inconsistent with the position its market analysts took in the 1982–1986 Development Plan, dated September 10, 1981: "In addition to the potential for three new aircraft entries, nacelle opportunities also exist in the reengining market.... [T]he programs offer large sales potential."

 Having briefly addressed the size of the future nacelles market and having found a probability of significant future sales opportunities in nacelles, the question remains whether nacelles constitute a separate submarket for purposes of Section 7 of the Clayton Act. We find that such a submarket does exist.

**3.** Reference to prime contractors under this subheading is intended to include only the "Big Three": Lockheed, McDonnell Douglas and Boeing.

Vought's 1980–1984 Development Plan identifies the nacelle market separately, as does Vought's 1982–1996 Strategic Plan. Vought's recognition of a separate market for nacelles in its marketing reports supports a finding of industry recognition of a separate market. Moreover, the affidavit of Mr. Speas states that the industry recognizes the nacelle market as a separate submarket. Further, manufacturing nacelles appears to require unique production facilities in conjunction with special expertise. Nacelles, pylons and thrust reversers "are more complex to manufacture and require a higher degree of specialization." (Speas Affidavit at ¶ 10). The sophisticated expertise required for this product's design and development was testified to by Mr. Speas at trial. Finally, we note that Vought's penetration into this product area as a vendor appears to have taken a number of years. Vought's efforts to penetrate the market began with its fact finding efforts in 1977, (Vought's 1980–1984 Development Plan, dated September 21, 1979), and as Vought reiterated so many times at the hearing, it has not yet realized one dollar in sales revenues from nacelles. The difficulty in market entry into nacelles by a company as capable and expert as Vought in aerospace technology suggests that those presently selling the nacelle product should be deemed to be "specialized vendors" within the meaning of *Brown Shoe.*

### B. *Lessening of Competition*

Having determined the existence of three separate markets within which the effects of the merger must be measured, we must consider whether competition therein may be lessened in the event LTV is successful in its takeover bid. In order to address ourselves to the "lessening of competition" it is, of course, necessary to understand the nature of competition in the various markets which we have defined.

### 1. *Carrier-Based Aircraft*

The United States Government is a monopoly buyer of the military aircraft in this country. In the bidding competitions for military aircraft, the Government decides which companies will be invited to participate, which companies will be qualified to make bids and which companies will receive contract awards. The industry is unquestionably unique in this regard.

In order to sell new tactical military aircraft to the Government, a prime contractor would have to expend great financial sums of money over a period of many years (for purposes of research and development) as a preliminary step to *entering* a competition for a military contract. The cost involved in entering a competition today would be in excess of $30 million. Because the market for *new* tactical military aircraft had been so speculative (Vought did not foresee any new competition until the mid-1980s or later), Vought decided in 1977 to direct its research and development efforts away from aircraft programs into the field of missiles. Accordingly, Vought has recently declined to participate in research and development studies for the Advanced Tactical Fighter (ATF) for the Air Force because it believed it would not have the capacity to make the bid. We accept Vought's position that it has no plans to enter a competition for new tactical aircraft, yet we reject its claim that it lacks the capability to do so. Moreover, we note that the market for carrier-based aircraft is broader than future opportunities provided by new competitions; indeed, the future market must include the probability of purchases of modified or reengined aircraft.

As stated in Grumman's Post-Hearing Memorandum, "[t]he Navy procurement process can be broken down into three distinct phases: (1) the *aircraft purchase phase*, where manufacturers of carrier-qualified aircraft compete with each other in selling airplanes to the Navy; (2) the *concept phase*, in which ideas for new aircraft are presented to the Navy by manufacturers or are developed by the Navy, and (3) the *design competition phase*, in which the Navy makes a formal request for proposals from manufacturers to design and build a new aircraft meeting the design and specifications set by the Navy." LTV has pressed the point that the next competition

for tactical military aircraft will occur at some distant time in the future, e. g., the late 1980s or the 1990s. The evidence unquestionably supports this finding, however, we attribute little weight to it in connection with the narrow question before us because of the probability of a market for the A–7 or the A–7X in the near future. Based on the testimony at the hearing, it appears that there is a reasonable likelihood of such a demand which would then place Grumman's A–6 in head-to-head competition with Vought's A–7 or A–7X in the aircraft purchase phase of the Navy procurement process. In so concluding, we feel compelled to address two subsidiary findings:

1. the likelihood of a future market for A–7s and

2. Vought's capability to produce the A–7 in the future.

■ Four factors lead us to the conclusion that future A–7 sales to the Navy are sufficiently probable to conclude that there is, in fact, a market:

1. The serious problems associated with the A–18 aircraft which has been highly criticized and which is not yet funded for production. Further delays would call for immediate delivery of the A–6 or A–7 attack aircraft. Vought's Development Plan, dated September 10, 1981, notes that the F/A–18 program is "beleaguered" and that the A–7X offers the Navy an option if the F/A–18 program folds;

2. The Navy has plans to substantially increase its carriers in operation from twelve to fifteen;

3. Vought's own marketing strategy is based upon the premise that opportunities will arise in the future for the purchase of the A–7 or A–7X; and finally

4. The turn of events since the hearing on this motion—the assassination of Egypt's President Anwar el-Sadat—have greatly enhanced the probabilities of demand for A–6s and A–7s in the immediate future. These are the only carrier-suitable attack aircraft ready to go into production.

Viewed in an industry context, considering the unique nature of the Navy procurement process, the uncertainty and the risk *generally* associated with the selling of tactical military aircraft to the Government, and the possibility of a future competition between Grumman's A–6 and Vought's A–7 (or A–7X), we conclude, for purposes of Section 7 of the Clayton Act, that Vought must be deemed a seller of tactical military aircraft even though there is a *possibility* that Vought will never realize revenues from such sales.

Our second subsidiary finding is that there is a good probability that Vought will not dismantle its A–7 production line and will retain the capability to produce them by generating limited foreign and domestic sales. We do not discount Mr. Thayer's testimony that the A–7 production facilities would be dismantled if new sales are not forthcoming within the next few months. Eight to twenty A–7 aircraft may be purchased by the Air National Guard (for land-based use) after 1981, depending on Congressional approval. Vought's 1982–1986 Development Plan, dated September 10, 1981, states: "An FY 1982 buy of the 12 A–7K aircraft needed to meet Air National Guard requirements would keep the A–7 production line operating into 1984." Further, Vought has recently made a specific proposal to sell from 40 to 68 A–7 aircraft to the Government of Malaysia, and is currently attempting to sell additional A–7s to Thailand, Singapore, Korea, Pakistan, as well as to remanufacture additional surplus U. S. Government-owned A–7s for Portugal. In dealing with probabilities, as we must, we find that Vought will have the capability to produce A–7s through the mid-1980s, if not longer.

Having determined that Vought is presently a seller (a competitor) within the carrier-based aircraft market, we must determine the probable anticompetitive effects of a Grumman-Vought merger. LTV asserts that there are at least seven aircraft manufacturers capable of supplying carrier-

based aircraft: Grumman, Northrop, McDonnell Douglas, Lockheed, Rockwell, General Dynamics and Boeing. Grumman would have us consider only itself, Vought and McDonnell Douglas. In support of its position, Grumman has submitted the funding for carrier-suitable aircraft over the past three fiscal years:

($ millions)

| MANUFACTURER & AIRCRAFT | 1979 | 1980 | 1981 | TOTAL |
| --- | --- | --- | --- | --- |
| GRUMANN | | | | |
| A–6 | $315 | $207 | $327 | $ 849 |
| F–14 | 861 | 722 | 919 | 2,502 |
| E–2 | 210 | 211 | 254 | 675 |
| EA–6B | 160 | 181 | 165 | 506 |
| | | | | $4,532 |
| | | | | (41.5%) |
| VOUGHT | | | | |
| A–7 | $304 | $229 | $201 | $ 734 |
| S–3 (With Lock-heed) | 35 | 42 | 33 | 110 |
| | | | | $ 844 |
| | | | | (7.7%) |
| McDONNELL DOUGLAS | | | | |
| A–4 | $ 21 | $ 16 | $ 1 | $ 38 |
| AV–8A/B | 173 | 185 | 333 | 691 |
| F–18 | 988 | 1334 | 1976 | 4,298 |
| F/RF–4 | 235 | 163 | 120 | 518 |
| | | | | $5,545 |
| | | | | (50.8%) |
| TOTAL $ (3 years) (Waesche Aff. App.A) | | | | $10,921 |

The accuracy of these figures has not been subjected to a meaningful challenge. However, as the Supreme Court noted in *United States v. General Dynamics Corporation*, 415 U.S. 486, 501, 94 S.Ct. 1186, 1195, 39 L.Ed.2d 530 (1974), "[e]vidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete." In its earlier landmark decision, the Court acknowledged the role of statistics as the primary index of market power but cautioned that "only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effects of the merger." *Brown Shoe Co. v. United States,* 370 U.S. at 322 n.38, 82 S.Ct. at 1522.

Having considered the market's structure, its history and its probable future, we believe that Grumman, Vought, McDonnell Douglas and Lockheed constitute all of the competitors in the market for carrier-based aircraft. Boeing's entry into the market is merely hypothetical. No evidence in the record suggests any interest on its part to develop carrier-based aircraft and the evidence concerning its capability to do so was not persuasive. The record shows that Northrop was only considered by the Navy on the VTX project because of its association with Vought. It would not be independently qualified to produce Navy aircraft. *See Northrop Corp. v. McDonnell Douglas Corp., supra,* 498 F.Supp. at 1115. As with Northrop, Rockwell has not shown itself to be acceptable to the Navy as independently qualified to manufacture Navy aircraft without the assistance of a company with carrier-based aircraft experience. Nor do we find that Rockwell's qualification to *bid*

as a prime contractor is inconsistent with our finding. Moreover, LTV's internal documents suggest that Rockwell would not have the capability to enter the Navy aircraft market on a grand scale, even if it so desired, because of its involvement with the B–1 Bomber. (Vought's 1982–1986 Development Plan Offsite Conference, dated August 6 and 7, 1981). We find that Lockheed is in the market because of its recent experience with carrier-based aircraft.

■ Accordingly, the level of concentration of market power for carrier-based aircraft is properly categorized as a "tight oligopoly"—"an industry in which eight firms or less supply 50% of the market, with the largest firms controlling 20% or more." *Stanley Works v. Federal Trade Commission,* 469 F.2d 498, 504 (2d Cir. 1972) (footnote and citation omitted). Though Vought's market share may be something less than 7.7% (as indicated by the statistics submitted by Grumman) given its shift in direction toward the missile market, it is still a significant power in the market. Given the high concentration of market power, substantial anticompetitive effects could be presumed from the proposed merger:

> "Where 'concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great.' " *United States v. Continental Can,* 378 U.S. 441, 461–62, 84 S.Ct. 1738, 1749, 12 L.Ed.2d 953 (1964), *quoting, United States v. Philadelphia National Bank,* 374 U.S. 321, 365 n.42, 83 S.Ct. 1715, 1742, 10 L.Ed.2d 915 (1963).

*See also, Stanley Works v. Federal Trade Commission, supra.* We believe this principle mandates our finding, and we so find, that a merger between Grumman and Vought might tend to substantially lessen competition.

Moreover, the finding is easily supported by some concrete examples. Grumman and Vought are head-to-head competitors for the attack aircraft portion of the Navy procurement budget. While the company resulting from a merger of Vought and Grumman might continue to offer both A–6s and A–7s to the Navy, there would be a diminished incentive to incur costs in upgrading and modifying these aircraft since there would be no other readily available supply of attack aircraft (assuming the A–18 does not go into production). Another example arises with the consideration of the VTX trainer program. Though Mr. Kirk, President and Chief Executive Officer of Vought, testified that Grumman's position as a competitor with the Northrop/Vought team in the VTX would not necessarily be threatened (assurances having been given to Mr. Kirk from the Chairman of Northrop), that testimony was not convincing. We are unpersuaded that the merged company would make as much of an expenditure in its effort on the VTX as the combined total expenditures of Vought and Grumman competing as separate entities. Any other conclusion appears inconsistent with the goal of profit maximization. These are just two examples of how competition might be lessened by a Vought/Grumman merger. The presumption of a Section 7 Clayton Act violation, as we find the facts in the instant matter, is not inconsistent with economic reality and is fully warranted in the instant case.

### 2. Subcontracting of Major Airframe Subassemblies

We believe that the merger of Grumman and Vought would tend to substantially lessen competition in the market for the subcontracting of major airframe subassemblies (hereinafter referred to as "market for subcontracting"). The evidence shows that the market for subcontracting is highly concentrated, with high barriers to entry, and includes only seven companies which participate in the market to any substantial degree. The subcontractors which have competed in the marketplace over the last ten years are as follows:

| Subcontractor | Subassemblies |
| --- | --- |
| Avco: | B757 Wing center sections |
| | L1011 Wing |
| Fairchild Industries: | B757 Fuselage sections |
| General Dynamics: | DC–10 Fuselage sections |

| Subcontractor | Subassemblies |
|---|---|
| Grumman: | B727 Wing sections |
| | B767 Wing sections |
| | B757 Wing elements |
| Northrop: | B747 Fuselage sections |
| Rockwell: | DC–9 Empennage sections |
| | B757 Fuselage sections |
| | B747 Fuselage sections |
| Vought: | B747 Empennage sections and fuselage sections |
| | B757 Empennage sections and fuselage sections |
| | DC–10 Empennage sections and fuselage sections |
| | B767 Empennage sections and fuselage sections |

(Speas Affidavit, ¶ 5, Vol. I).

LTV contends that upwards of twenty-five or more companies compete in this submarket, a contention we reject without hesitation. The testimony, affidavits and deposition pertinent to this subject show that:

1. None of the Big Three (Lockheed, McDonnell Douglas and Boeing) should be included in the market because they are never awarded subcontracts on each other's aircrafts;

2. The additional domestic firms identified by LTV do not have the *capability,* the *expertise,* or the inclination to be successful sellers of *major* subassemblies; and

3. The seven foreign aircraft manufacturers identified in the Speas affidavit (only six of which are identified in ¶ 4 of the Randall affidavit) are not included in the market because United States aircraft manufacturers

have awarded subcontracts to those concerns simply as satisfaction of a precondition for selling aircraft to government controlled airlines in their countries. Accordingly, such allocated subcontracting work is *not* available for "competition" from other subcontractors and constitutes a different submarket in the aerospace industry.

We find that the competitors in the market for subcontracting are limited to Avco, Fairchild Industries, General Dynamics, Grumman, Northrup, Rockwell and Vought.

The size of the market for subcontracting will be approximately $700 million to $1 billion annually over the next several years. Mr. Speas considered both Grumman and Vought to be "a substantial factor in this market and ... likely to remain so. . . ." We agree after reviewing estimates of market shares for major subassemblies and nacelles (table and footnotes reproduced below), which estimates remain largely unimpeached by LTV's challenges to their validity (most significantly, we note that most of the Vought and Grumman sales in the combined figures are due to major airframe subassembly contracts—Vought has not had a dollar of sales from nacelles to date—moreover, assuming that the "total market" combined figures contain substantial nacelles sales, then the combined market shares for subcontracting major subassemblies would be understated): [4]

4. Another challenge to the validity of the statistics reflecting market share which have been offered by Grumman is that they fail to account for the military aircraft subcontracting market. The testimony was that the military aircraft subcontracting market for aircraft comparable in size to large civil transports is approximately 10 percent of the civil subcontracting market. Therefore, even if we were to take into account the military market, the respective market shares for Grumman and Vought would not alter significantly:

Major Subassembly and Nacelle Subcontracting Markets

(Combined)

(millions of current dollars)

| | 1981 | % | 1984 | % |
|---|---|---|---|---|
| Vought | 150 | (13.6%) | 214 | (13.0%) |
| Grumman | 98 | ( 8.9%) | 480 | (29.1%) |

#### Major Subassembly and Nacelle Subcontracting Markets (Combined)
(millions of current dollars)

| | 1981 | % | 1984 | % |
|---|---|---|---|---|
| Vought (80%) [a] | 150 [b] | (15.0%) | 214 [b] | (14.3%) |
| Grumman | 98 [c] | ( 9.8%) | 480 [c] | (32.0%) |
| Total Market [d] | 1,000 | (100.0%) | 1,500 | (100.0%) |
| Combined Market Shares | 248 | (24.8%) | 694 | (46.3%) |

[a] Eighty percent of Vought's projections of its subcontracting revenues (Sablich Aff. ¶ 4) are estimated to comprise major subassemblies and nacelles.

[b] Source: 1982–1986 Vought Marketing Plan, Hearing Ex. 14, Tab 1 at 4–7. The figures shown are 80% of the total subcontract revenues shown in the Vought document.

[c] Sablich Aff. ¶¶ 2, 3.

[d] Speas Aff. ¶¶ 9, 11.

The evidence suggests that a combination of Grumman and Vought would make the resulting company a *dominant* force in the market for the subcontracting of major airframe assemblies. Grumman and Vought are two of the strongest competitors among the seven companies in the market. In its 1982–1986 Development Plan, dated September 10, 1981, Vought states that: "currently, Vought holds a very strong position as a subcontractor in the aerospace industry and *expects to retain this position* through the Development Plan time frame." (emphasis added). The competitive analysis in that document further states: "Vought's principal competitors are Grumman (which has a dispersed base of specialty facilities for composites, nacelles, subcontracts, etc.) and Fairchild, against whom Vought successfully competed for the LRCA aft intermediate fuselage." The Vought plan downgraded the future significance in the market of Rockwell and AVCO who account for two of the seven competitors in the market. An LTV document, which was presented to the LTV Board of Directors on September 18, 1981, as part of its Acquisition Analysis with respect to its tender offer, describes Vought's subcontract business as "VERY STRONG," Grumman's as "GOOD" and the combination of the two as "VERY STRONG + ".

Grumman and Vought have engaged in head-to-head competition for sections of the fuselage for the Boeing 757, and the empennage for the Lockheed CX. The evidence of their respective power in this market is clear. The merger of Grumman and Vought would eliminate the competition between them in the bidding on major airframe subassembly subcontracts and the competition which occurs before the formal bidding stage. In concluding that their merger would substantially weaken competition in the market, we are reminded of the Congressional mandate given the Courts to

#### Major Subassembly and Nacelle Subcontracting Markets
(Combined)
(millions of current dollars)

| | 1981 | % | 1984 | % |
|---|---|---|---|---|
| Total Market (including military subcontracting) | 1,100 | (100.0%) | 1,650 | (100.0%) |
| Combined Market Shares | 248 | (22.5%) | 694 | (42.1%) |

prevent further concentration in already concentrated industries:

"This intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects. Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *United States v. Philadelphia National Bank*, 374 U.S. at 363, 83 S.Ct. at 1741.

The marriage of Grumman and Vought must be enjoined to prevent further concentration in this market.

### 3. *Nacelles*

The size of the nacelle subcontract market measured by annual sales ranges from $350 million to $500 million. Grumman's 1981 revenues from manufacturing nacelles under subcontract will be approximately $63 million. Vought has no sales revenues from nacelles as yet but is currently manufacturing nacelles for the Canadair CL–600 Challenger and should realize approximately $20 million of revenues in 1982.

The market for nacelles is most notably characterized by the likelihood of substantial growth. Vought's 1982–1996 Strategic Plan forecasts a 350% growth in the opportunities for annual nacelles sales for U. S. produced aircraft between 1981 and 1996 ($2.7 billion in 1996). Internal documents from Vought state that the only two "viable nacelle competitors" are Rohr and Grumman. Rohr's estimated share of the nacelles market is somewhere between 60% and 80%. However, as Vought's Business Plan for expansion into the nacelle market indicates (dated September 1, 1981), Rohr is losing its position of dominance in the market because its principal customer, Boeing,

set up its own nacelle facility. Vought's Plan projects "that Boeing will [not] sell nacelles to anyone else" and it notes that Short Brothers, another manufacturer of nacelles, has not been a serious factor in the U. S. market. The Plan also states that Grumman has competed against Vought for every opportunity.

Vought is in the market for nacelles and is making strides to become a dominant force in the market. It intends to become "the No. 2 nacelle supplier by 1986." The strategy for achieving its improved position is tied to its success in winning the 727–200 reengining program or the A320 program where Grumman is seen as the "major competition although Rohr is not counted out." (Hearing Ex. 14, Tab 13 at 2, 10). Of course, competition with Grumman for these programs would be extinguished in the event of a merger.

Statistics of present market share would not be useful in predicting the probable anticompetitive effects of a Grumman-Vought merger. Though neither command a significant share of the market by any standard, they are both intent on capturing new business in this rapidly expanding and highly concentrated market. To remove one competitor from this market would undoubtedly tend to substantially lessen competition.

We believe that Grumman has shown a likelihood of success on its antitrust claims.

### III. *Williams Act Claims*

Grumman claims that LTV's Offer to Purchase contains numerous misrepresentations and omissions of material facts in violation of §§ 14(d) and (e) of the Securities Exchange Act.

Sections 14(d) and (e) of the Securities Exchange Act, 15 U.S. § 78n(d) and (e), are the provisions of the federal securities laws that regulate tender offers. Section 14(d) provides for the disclosure of information relating to the offer. Section 14(e), an antifraud provision, provides, in pertinent part:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact

necessary in order to make the statement made, in light of the circumstances under which they are made, not misleading or to engage in any fraudulent, deceptive or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

The Securities and Exchange Commission (SEC) is empowered to promulgate rules to make effective the provisions of the Act. Rule 14d–100, 17 C.F.R. § 240.14d–100, describes the form and content of the Schedule 14D which must be filed with the SEC and mailed to the target company. Rule 14d–6, 17 C.F.R. § 240.14d–6, details what information must be contained in the Offer to Purchase, the solicitation document mailed to shareholders or otherwise publicly disseminated. Generally, the rules, like the statute, require that the Schedule 14D and the Offer to Purchase contain all the facts material to a stockholder's decision as to what course to take in response to the tender offer.

In *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 499, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), the Supreme Court, in the context of a proxy contest, enunciated the test for determining whether an omission or misrepresentation in disclosure documents is material:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly

altered the 'total mix' of information made available.

This test was adopted by the Second Circuit as the test to be applied under § 14(e). *Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 360–61 (2d Cir. 1979); *Prudent Real Estate Trust v. Johncamp Realty, Inc.*, 599 F.2d 1140, 1146 (2d Cir. 1979).

The test should be applied with the recognition that its primary purpose is to protect the shareholder, who is required "to make an investment decision and to do so under pressure" in response to a tender offer "announced under conditions designated to leave the impression that immediate response is necessary." Hearings on S.510, 90th Cong., 1st Sess., p. 17 (1967) (Testimony of Manual F. Cohen, then Chairman of the SEC). However, it must also be recognized that it was Congress' intent to avoid "tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid." H.Rep.No.1711, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad. News 2811, 2813. Thus, the seriousness of the omission or misrepresentation must be measured within the context of the "stresses of the marketplace" without imposing "an unrealistic requirement of laboratory conditions that might make the ... statute a potent tool for incumbent management to protect its own interests against the desires and welfare of the shareholders." *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969).

With these general principles in mind, we now turn to the merits of the specific claims of material misrepresentations raised by Grumman.

### a. *Disclosure Relating to Antitrust Laws*

Regulation 14d–6(e)(vii), incorporating 14d–100, Item 10(c), requires that "[i]f material to a decision by a security holder whether to sell, tender or hold securities being sought in the tender offer," the offeror in the Offer to Purchase "furnish information" as to "[t]he applicability of the antitrust laws."

In *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.,* 476 F.2d 687, 697 (2d Cir. 1973) (quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir. 1968) (en banc), *cert. denied sub nom., Kline v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)), the Second Circuit described what information relating to the antitrust laws would satisfy the disclosure requirements of the Act:

> [T]he disclosure requirements of the securities laws require "nothing more than the disclosure of basic facts so that outsiders may draw upon their own evaluative experience in reaching their own investment decisions with knowledge equal to that of the insiders.

In that case, the Court found that the defendant G & W omitted to state certain "basic facts" which would have indicated that there were substantial antitrust obstacles to G & W's purchasing a large portion of A & P's shares, i.e., ownership by the Chairman of G & W of a controlling interest in a major competitor; G & W's previous purchase of a large portion of A & P stock; and G & W's control of actual or potential suppliers of A & P. "Basic facts" relating to antitrust issues also includes information about the market position of the two companies relating to their same or similar products, which may produce the anticompetitive effect once the companies are merged. *See Elco Corporation v. Microdot, Inc.,* 360 F.Supp. 741 (D.Del.1973); *Chemetron Corp. v. Crane Co.,* 1977–2 Trade Cas. ¶ 61,717 (N.D.Ill.1977). Anticompetitive effect may be found in any one of the various lines of commerce in which the acquired and acquiring companies are engaged, "whether or not that line of commerce is a large part of business of any of the corporations." *Chemetron Corp. v. Crane Co., supra,* 1977–2 Trade Cas. ¶ 61,-717, at 72,930 (quoting *U. S. v. Bethlehem Steel Corp.,* 168 F.Supp. 576, 595 (S.D.N.Y. 1958)).

In this case, the Offer to Purchase contains the following information which may be said to be pertinent to the antitrust issue:

Under the heading "Certain Information Concerning the Company" (p. 7), LTV states the various lines of business in which Grumman engages. Under the subheading "Aircraft and Space" is a list of the specific markets in which it operates, i.e., "the design and production of military aircraft, space systems, and commercial aircraft components and subassemblies." Under the heading "Certain Information Concerning the Purchaser and LTV" (p. 8), it is stated that one of the industries in which LTV engages is "aerospace", without any further description of particular markets.

On page 12 of the Offer to Purchase, under the heading "Background of the Offer" is reprinted a press release of September 23 issued by LTV, announcing the tender offer, in which Paul Thayer is quoted as follows:

> Grumman ... and Vought ... have names that are synonymous with naval aviation. As two of the nation's oldest aircraft contractors, with a combined experience of more than 150 years, they have produced some of the nation's most famous combat aircraft.
>
> Grumman, with its production of several U. S. Navy aircraft ... is a major prime contractor as a supplier of tactical aircraft. Mr. Thayer noted that in recent years Vought has been phasing out as a prime aircraft manufacturer for the U. S. Navy and has become an important missile manufacturer for the Army and Air Force.

A response by Grumman of the same date is also reproduced (p. 13) in which the Chairman of Grumman is quoted as saying, among other things: "Bierwirth said the board will consider legal factors including antitrust implications."

While LTV may honestly differ with the legal conclusions relating to the antitrust issues in this case, its awareness of the antitrust problems associated with this tender offer is clear. This fact makes more glaring the deficiency in the omission of "basic facts" pertaining to the antitrust issues. While the Offer to Purchase states that Vought is no longer in the Naval air-

craft business but rather has become a missile manufacturer, significantly, no mention is made of Vought's continuing effort in the production of commercial aircraft components or subassemblies. Moreover, what information there is in the Offer is scattered, with the effect of obscuring its significance. No information suggesting competition between Grumman and Vought is contained under the headings Antitrust[5] or Information Concerning the Company and Purchaser.

While we do not believe that the holding in *Gulf & Western Industries, supra,* 476 F.2d 687, imposes upon the offeror an obligation to state in the tender offer the possibility of an antitrust action, even where the antitrust problems are clear, *compare Chemetron Corp. v. Crane Co., supra,* 1977–2 Trade Cas. ¶ 61,717; *Elco Corporation v. Microdot, Inc., supra,* 360 F.Supp. 741, in the absence of such a statement the offeror has the obligation to fully present the "basic facts". In this case, we find that these material facts were omitted from the Offer to Purchase.

### b. *Non-Aerospace Assets*

SEC Regulation 14d–6(e)(vii), incorporating Regulation 14d–100, Item 5(b), requires the offeror to describe any plans or proposals which relate to a "sale or transfer of a material amount of assets of the subject company or any of its subsidiaries." Regulation 14d–6(e)(vii), incorporating Regulation 14d–100, Item 4, requires an offeror, where any part of funds for a tender offer are borrowed, to "describe any plans or arrangements to finance or repay such borrowings; or if no such plans or arrangements have been made, make a statement to that effect."

In the Offer to Purchase, under the heading "Purpose of the Offer and Plans for Control" (p. 15), LTV states the following:

The Purchaser and LTV have made a preliminary study based upon the information currently available to them of the possibility of disposing of some or all of the Company's non-aerospace operations, including the Company's foundry operations, energy operations (which include solar, water heating and fusion systems), transportation operations (which include the manufacture and sale of buses, emergency vehicles and truck bodies and frames), marine operations (which include the manufacture and sale of hydrofoil boats, sailboats and canoes) and industrial control and measuring devices for the petroleum industry by sale to third parties. Following completion of the Offer, LTV intends to conduct a complete review together with Company management of all of the Company's operations and will not make a final determination as to whether or not to carry out any such disposition until after the completion of such review. It is not expected that any such dispositions would take place before the consummation of the merger or other business combination transaction described above.

Under the subsequent heading "Source and Amount of Funds" (p. 17), LTV states:

In the event that any of the non-aerospace business, property and assets of the Company are sold to third parties after the Purchaser has gained control of the Company and the merger or other business combination transaction referred to in Section 10 above has been consummated, the Purchaser intends to use the net proceeds from such sales to make repayments under the Purchase Credit. See Section 10. In addition, the cash flow from the Company and from LTV and its subsidiaries, as well as other sources, which may include the proceeds of other long-term or short-term borrowings, including the sale of debt securities or the proceeds of the sale of equity securities, would also then be available to repay the borrowings made by it in connection with the Offer.

---

**5.** The information concerning the antitrust laws contained in the Offer to Purchase under the heading "Antitrust" by which defendants purport to satisfy the requirement of complete disclosure is irrelevant to the real antitrust issues looming over the tender offer.

Plaintiff claims that the above statements are misrepresentations because they do not accurately reflect LTV's intentions regarding the sale of Grumman's non-aerospace assets. It claims that LTV, rather than having engaged in only a preliminary study, had a fixed intention and an agreement with its lender to sell the non-aerospace assets. In support of its position Grumman produces the following:

1. An internal memorandum of Manufacturers Hanover Bank, (Vol. III, Ex. 22), authored by a Vice President and addressed to the Chairman in which it is stated that LTV agreed to prepay the proposed $300,000,000 acquisition credit with the proceeds from the sale of Grumman's non-aerospace assets, the net proceeds estimated at $130,000,000.

2. The LTV Acquisition Analysis, (Vol. III, Ex. 23), the internal LTV analysis submitted to the Board, on which the tender offer was based, and the Analysis of Proposed Acquisition (Vol. III, Ex. 24), the sole document submitted by Lehman Brothers to LTV prior to the offer, which are both entirely predicated on the assumption that the non-aerospace assets would be sold.

3. Testimony by Lehman Brothers and Manufacturers Hanover that their analyses were based on the same assumption.

Defendants contend that no final decision has been made to sell the non-aerospace assets. They submit the deposition testimony of a Vice President of Manufacturers Hanover and of LTV executives which is to the effect that the loan commitment was not based on the sale of the assets.

That LTV has agreed to sell the non-aerospace assets to pay the debt incurred by the purchase of Grumman stock does not necessarily mean that it will. The agreement to sell the assets assures to some extent the payment of the debt but does not foreclose some other form of payment. As defendant points out, the disclosure must be viewed in light of Judge Friendly's admonition that the offeror must be just as careful not to overstate the definiteness of its plans as not to understate them. *Elec-*

*tronic Specialty Co. v. International Controls Corp., supra,* 409 F.2d at 948; *see also Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075 (5th Cir. 1970) (Target companies must not be provided the opportunity to use the future plans provision as a tool for dilatory litigation).

We find that the Offer to Purchase informs the shareholders that there is a possibility that Grumman's non-aerospace assets will be sold and the proceeds used to pay the debt incurred in the purchase of Grumman shares. Plaintiff has not sustained its burden of showing a likelihood of success on the merits of this issue.

c. *LTV's Financial Condition*

SEC Regulation 14d–6(e)(viii) states that the Offer to Purchase must contain the disclosure required by Item 9 of the Schedule 14D–1 or a fair and adequate summary thereof. Regulation 14d–100, Item 9 reads:

Where the ... bidder's financial condition is material to a decision by a security holder of the subject company whether to sell, tender or hold securities being sought in the tender offer, furnish current, adequate financial information concerning the bidder.

Instruction 1 to Item 9 reads:

The facts and circumstances concerning the tender offer, particularly the terms of the tender offer, may influence a determination as to whether disclosure of financial information is material. However, once the materiality requirement is applicable, the adequacy of the financial information will depend primarily on the nature of the bidder.

As stated by plaintiff, it is precisely when the offer leaves a substantial number of public shareholders and contemplates a subsequent merger that financial data is most material. *See Prudent Real Estate Trust v. Johncamp Realty, Inc., supra,* 599 F.2d at 1145–46 (2d Cir. 1979); *Corenco Corp. v. Schiavone & Sons, Inc.,* 362 F.Supp. 939, 950 (S.D.N.Y.), *aff'd in part,* 488 F.2d 207 (2d Cir. 1973). Special concern for full disclosure in the situation where the offer is for less than all shares was also expressed in

the House Report, H.R.Rep.No.1711, 90th Cong. 2d Sess. 2 (1968), *reprinted in* [1968] U.S. Code Cong. & Ad.News 2811, 2812.

Financial information about LTV is essential to a Grumman shareholder. "Since many Grumman shareholders—regardless of whether they hold their shares or tender—may remain a Grumman shareholder if the offer is oversubscribed, it is essential that they be given fair and accurate information about LTV and its financial health in order to assess (1) whether LTV can actually carry out the second stage of its takeover plan for cash; (2) whether, if LTV offers securities for these remaining shares as it has reserved the right to do, those securities will make a desirable investment; and (3) whether, if the second stage does not take place, his continuing investment will be a desirable one." Plaintiff's Memorandum pp. 57–58 (10/5/81). We turn now to Grumman's specific claims.

### (1) *Total Debt*

In the Offer to Purchase, under the heading "Selected Financial Data" LTV asserts in its summary of balance sheet information that its total debt and capitalized leases amounts to $1,395,100,000. In its prospectus dated May 28, 1981, LTV listed its liabilities as $1.6 billion more than the amount stated in the Offer to Purchase. As set forth in the affidavit of Stewart Kahn, a partner in Arthur Anderson & Co., LTV's Offer to Purchase understates its "debt" by well over $100,000,000, if one reads total debt to mean all debt represented by written evidence of indebtedness, and over 1.6 billion, if one reads total debt to mean all balance sheet liabilities. Defendant incorrectly used the term total debt to designate the amount of only its long term debt.

Defendant does not rebut the correctness of plaintiff's calculations or its definition of the term "total debt". In its defense LTV states that LTV's publicly available financial statements were incorporated by reference into the Offer to Purchase. However, Regulation 14d–6(e)(viii) and 14d–100, Item 9, Instruction 2, indicate that an offeror may not incorporate by reference in the Offer to Purchase material facts contained in previously filed financial statements. The offeror must either attach the financial statement to the Offer to Purchase or include all material information in a "fair and adequate summary thereof." In any event, as plaintiff correctly asserts, an offeror cannot escape responsibility for material misstatements of its financial position in the Offer to Purchase simply by incorporating by reference its financial statements. We find that the gross misstatement of debt, because it is such a significant sum and portion of the actual debt, is a material misstatement of fact.

### (2) *Environmental Expenditure and Unfunded Pension Liabilities*

According to financial statements filed with the SEC (Vol III, Ex. 31) between now and 1982 LTV must expend, to the extent quantifiable, between $185 and 240 million in order to meet environmental standards and to comply with the terms of agreements between LTV and federal and state environmental authorities. This liability was not mentioned in the Offer to Purchase.

Also according to financial statements filed with the SEC (Vol III, Ex. 32), LTV has unfunded pension liabilities totalling $225,000,000 at December 31, 1980. This sum was not reported in the Offer to Purchase.

In view of the substantial amount of these liabilities and the important role of financial information in determining what action a shareholder should take in response to this tender offer, we find that the failure to include these significant liabilities is an omission of material fact.

### (3) *The VTX Competition*

As previously mentioned, Grumman is a prime contractor in its team with Beech and Link Corporations, and Vought is teamed with Northrop Corporation in the competition to acquire the multi-billion dollar contract to build the VTX. The agreement between Vought and Northrop Corporation dated September 28, 1979 (Vol III, Ex. 39) contains the following clause:

LTV ... shall not, during the term of this agreement, undertake to support any other bidder, for any phase of the Program ....

The Offer to Purchase contains no information regarding this competition; moreover, it does not disclose the existence of the covenant not to compete between Vought and Northrop. The consequences to Grumman and to its employees if Grumman must withdraw from the competition are, to say the least, serious, considering the costs involved in making the bid and the possible loss of the contract. In *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973), the Second Circuit found that the failure to disclose that the success of the tender offer might result in a compromise of a $2.4 million debt between the offeror and target was a material omission. We believe that the circumstances surrounding the VTX competition are equally if not more compelling. Accordingly, the failure to disclose the existence of the agreement was a material omission.

For the reasons discussed above, we find that plaintiff has shown a likelihood of success on the merits on its claim that the Offer to Purchase contains omissions or misrepresentations of material facts relating to application of the antitrust laws, certain aspects of its financial condition and the circumstances surrounding the VTX competition.[6]

## IV. *Preliminary Relief*

A preliminary injunction is "an 'extraordinary and drastic remedy which should not be routinely granted.'" *Buffalo Forge Co. v. Ampco Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981), *quoting, Medical Society of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977). The standard for the grant of a preliminary injunction is as follows:

"[A] showing of (a) irreparable harm *and* (b) *either* (1) likelihood of success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (emphasis added).

We believe that Grumman has established all of the elements necessary to entitle it to preliminary injunctive relief pending a full trial on the merits in this action.

As found in the foregoing sections, Grumman has established a "likelihood of success on the merits" as to its claims both under the antitrust laws and under the federal securities laws. However, even assuming that its showing rises only to the level of having "raised sufficiently serious questions going to the merits to make them a fair ground for litigation," we find that those interests represented by Grumman are threatened with irreparable harm and that the balance of hardships tips *decidedly* in favor of those interests.

## A. *Interest of LTV*

LTV contends that Grumman has shown no irreparable injury to it or its shareholders. It further contends that LTV stands to suffer irreparable injury in the event an injunction were to issue. Mr. Gleacher, a Managing Director of the investment banking firm of Lehman Brothers Kuhn Loeb Incorporated, stated in an affidavit that an injunction would have the result of depriving the Grumman stockholders of the premium presently available to them (approximately $200 million) by virtue of the tender offer. However, Mr. Gleacher failed to comment on the possibility of another tender offer by LTV following a trial on the merits of the matters herein issue.

Although LTV has a right to invest on behalf of its shareholders, "the interest urged can only be so where a *lawful* acquisition or investment is involved ...." *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company, Inc.*, 476 F.2d 687, 698 (2d Cir. 1973) (emphasis supplied in original). Moreover, no persuasive evidence

---

**6.** We have examined Grumman's other claims of omissions or misrepresentations of material facts and find that plaintiff has not sustained its burden in regard to those claims.

has been offered to show that a second tender offer made after the trial would not be feasible. We refuse to take judicial notice of that fact. In commenting on the injunction issued against the consummation of the tender offer in *Gulf & Western, supra*, Judge Timbers noted that "the preliminary relief granted is not nearly as final as [the takeover company] urged" since it would not be foreclosed from renewing its takeover bid following a trial on the merits.

### B. *Interest of Grumman*

The relationship which Grumman has with its employees has been described as unique. The President of Grumman who has been with the company for some thirty-five years testified that he was "concerned that the efficiencies which stem from that unique association ... would be destroyed" if the takeover were successful. We must conclude that the consummation of LTV's tender offer would seriously disrupt Grumman's business posing irreparable injury to Grumman, and, as discussed below, the nation and the public at large.

Further, we note LTV's "possible," "tentative" or "firm" plans to liquidate the non-aerospace segments of Grumman. If the tender offer is consummated, if the non-aerospace segments are sold, and subsequently, if the antitrust violations are found at trial, Grumman could not be restored to its original position. The irreparable harm Grumman stands to suffer in the aftermath of an LTV takeover is irrefutable.

### C. *Interest of Grumman Shareholders*

With reference to the claim by LTV that "the parties of the shareholders of the acquired company (in this case 16,500 shareholders) are the parties with the franchise and the paramount interest ...," we note that the Grumman shareholders, like LTV, "have no inherent right to proceed with an unlawful tender; a requirement of lawfulness is included by implication in every tender offer." *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d at 698. Moreover, the claimed threat to the shareholders' right to franchise is of questionable weight here since that right "presupposes" that the shareholders have been apprised of all the material facts pertinent to their decision. *Id.*

### D. *Interest of the Public*

Finally, the Second Circuit has spoken clearly in directing district courts that, in cases such as this where there are serious questions concerning antitrust and securities laws violations, the public interest must be considered. *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d at 698–99; *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 819 (2d Cir. 1979) (per curiam); *see Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1121 (2d Cir. 1975). Given the showing of a Section 7 violation, the threatened injury to the public interest weighs heavily in our balancing of the equities. In discussing this paramount interest, the Second Circuit offered the following insight:

"If [the takeover company] is in fact proceeding in violation of the antitrust and securities laws, a preliminary injunction would serve the public interest as much as [the target company's] private interests. In this regard, by asserting these claims, [the target company] is assuming a dual role, including that of a private attorney general. Since it is impossible as a practical matter for the government to seek out and prosecute every important violation of laws designed to protect the public in the aggregate, private actions brought by members of the public in their capacities as investors or competitors, which incidentally benefit the general public interest, perform a vital public service. As the Supreme Court said in *J. I. Case Co. v. Borak*, 377 U.S. 426, 432 [84 S.Ct. 1555, 1560, 12 L.Ed.2d 423] (1964), private actions provide 'a necessary supplement' to actions by the government and 'the possibility of civil damages or injunctive relief serves as a most effective weapon in the enforcement' of laws designed to protect the public interest. Therefore, as in actions brought by the government, doubts as to whether an in-

junction sought is necessary to safeguard the public interest—when the public interest involved is as clear, pervasive and vital as the record here demonstrates—should be resolved in favor of granting the injunction." *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d at 698–99.

Moreover, the interest of the public here is greater than in the ordinary case since a lessening of competition might very well affect the quality and price of weapons sold to the United States Navy. Both Admiral Elmo R. Zumwalt, Jr., former member of the Joint Chiefs of Staff and retired Chief of Naval Operations, and George Spangenberg, former Director of the Evaluation Division of the Development of the Navy, testified that a merger between Grumman and Vought would have adverse consequences for the United States national defense.

### E. *Conclusion*

We find that the balance of hardships tips decidedly in favor of the interests represented by Grumman, the party moving for preliminary relief.

### V. *Summary*

We find that Grumman is entitled to a preliminary injunction enjoining LTV from proceeding any further in making a tender offer for Grumman stock. Plaintiff's motion for a preliminary injunction is granted. Security in accordance with Rule 65(c) of the Federal Rules of Civil Procedure is determined to be in the amount of five million ($5,000,000) dollars.

This memorandum of decision contains findings of fact and conclusions of law required under Rule 52(a) of the Federal Rules of Civil Procedure.

A preliminary injunction order has been signed simultaneously herewith.